604 So.2d 1330 (1992)
STATE of Louisiana
v.
Johnnie HANKERSON.
No. KA 91 0479.
Court of Appeal of Louisiana, First Circuit.
May 22, 1992.
Doug Moreau, Dist. Atty. Baton Rouge, by Robert Piedrahita, Dan Grady, Asst. Dist. Attys., for plaintiff/appellee.
Lewis O. Unglesby, Baton Rouge, for defendant/appellant.
Before LANIER, CRAIN and GONZALES, JJ.
*1331 CRAIN, Judge.
Defendant, Johnnie Hankerson, was charged by bill of information with one count of conspiracy to distribute cocaine of an amount equal to or greater than 200 grams but less than 400 grams, in violation of La.R.S. 14:26, 40:964 and 40:967 A; and possession of cocaine of an amount equal to or greater than 200 grams but less than 400 grams, in violation of La.R.S. 40:964 and 40:967 A. He was tried by a jury, which convicted him as charged. The trial court imposed a sentence of ten years at hard labor, with credit for time served, for the conspiracy conviction; and a concurrent term of ten years at hard labor, with credit for time served, for the conviction of possession of cocaine. After finding that defendant had rendered "substantial assistance" to law enforcement officers, the court did not deny defendant eligibility for parole. See La.R.S. 40:967 G, prior to its amendment by Acts 1991, No. 100. Defendant appealed, urging eleven assignments of error. The assignments of error numbered three, five and eight were specifically abandoned.
Defendant was jointly charged with his brothers, Bradford and Gregory Hankerson. The charges against Bradford Hankerson were dismissed prior to trial. Gregory Hankerson and defendant were tried together. Gregory also was convicted as charged, and he separately appealed. See KA 91 0478, 604 So.2d 1323, also decided this date.
The charges were instituted after a search of the Hankersons' Baton Rouge residence resulted in the discovery of nearly one and one-half pounds of a cocaine mixture. Most of the contraband was located in a dresser drawer in Gregory Hankerson's bedroom. Twenty-five packets (totalling approximately twenty-two ounces) were recovered from the dresser. At the time of his arrest, an additional one ounce packet of cocaine was discovered in a pocket of Gregory Hankerson's clothing. Tests revealed that each of the packets was approximately 50% pure cocaine (mixed with a quantity of inositol, a substance commonly used to dilute cocaine.) The total weight of the pure cocaine seized during the search was 299.1 grams. Two empty bottles that had contained inositol, three putty knives, and a number of plastic bags also were found in the bedroom. Elsewhere in the house, agents found a notebook suggesting an extensive distribution scheme, a scale, more bags, and a razor.
The search was conducted pursuant to a warrant obtained after a confidential informant made a purchase from a distributor identified as "Greg." The "controlled buy" occurred in the Hankersons' residence on the same day that the warrant was executed, and it was monitored and taped through the use of electronic surveillance equipment. The "Greg" who participated in the controlled buy was later identified as defendant's brother, Gregory Hankerson. Another suspect, Greg Green, was arrested when he came to the house after the Hankersons and two female acquaintances present in the house during the execution of the warrant had been apprehended. Greg Green and Gregory Hankerson apparently shared the bedroom where the cocaine was found. Green also had a small amount of cocaine on his person when he was arrested.
After his arrest, Gregory Hankerson admitted that the cocaine found in the pocket belonged to him; however, both brothers initially disavowed knowledge of the cocaine in the bedroom. Later, they informed investigating officers that defendant (who apparently was living with his mother in Fort Lauderdale, Florida and not with his brothers in Baton Rouge) and Gregory Hankerson had procured the cocaine in Florida and had it transported to Baton Rouge by another individual. The brothers offered to arrange a large transaction in order to obtain a letter confirming their assistance to law enforcement officers. Although the state agreed to this arrangement (and a letter ultimately was sent to the trial court, outlining the extent of cooperation by the Hankersons), the brokerage agreement was terminated on the advice of the Hankersons' attorney and was never completed.

*1332 ADMISSIBILITY OF STATEMENTS
In assignments of error two, four and six, defendant claims that the trial court erred by permitting the state to introduce admissions made by him and his brother, Gregory, to Captain Don (Bud) Connor at the Sheriff's department office. He claims the statements were inadmissible because they were induced by an offer by Captain Connor to write a letter indicating they had rendered substantial assistance to law enforcement agents; and therefore, the statements were not admissible under La.R.S. 15:451.
Captain Connor interviewed the Hankerson brothers shortly after they were booked. He read them the statute under which they would be charged, including the penalty in effect at that time (which provided that the sentencing court can impose a term making the accused probation or parole eligible only if the state certifies that the accused has rendered substantial assistance to law enforcement officers.) After the Hankersons expressed an interest in arranging for a large delivery of cocaine, Captain Connor advised them that an agreement of that nature could be made only if the brothers first confessed to the charges for which they were arrested. He obtained an attorney for them; and, after consultation with counsel in which defendant apparently was advised to cooperate, defendant agreed to the terms required by Captain Connor and revealed detailed information concerning the source of the cocaine at issue and the method of its procurement.
"It is well settled that confessions obtained by `any direct or implied promises, however slight, [or] by the exertion of any improper influence, are involuntary and inadmissible as a matter of constitutional law.'" State v. Jackson, 414 So.2d 310, 312 (La.1982), quoting Bram v. United States, 168 U.S. 532, 542-543, 18 S.Ct. 183, 187, 42 L.Ed. 568, 573 (1897). When the state seeks to introduce into evidence an inculpatory statement, it has the burden of establishing beyond a reasonable doubt that the statement was made freely and voluntarily and not under the influence of fear, duress, intimidation, menaces, threats, inducements or promises. La.R.S. 15:451; State v. Jackson, supra.
"The admissibility of a confession is in the first instance a question for the trial judge and his conclusions on the credibility and weight of the testimony relating to the voluntary nature of the statement will not be overturned unless they are not supported by the evidence." State v. Jackson, 414 So.2d at 312. "However, a reviewing court cannot avoid its responsibility to examine the record to be certain that the State has fully borne its heavy burden of proof in these cases." State v. Peters, 315 So.2d 678, 681 (La.1975). "[A] review of the totality of the circumstances under which the statement was given is still required and any inducement offered to the defendant is but one fact, albeit an important one, in that analysis." State v. Lewis, 539 So.2d 1199, 1201-1202 (La.1989), quoting United States v. Long, 852 F.2d 975, 977 (7th Cir.1988). "The state of mind of the defendant and the interrogating officer are highly relevant to resolution of the issue whether the inducement or promise was calculated, under the circumstances of the particular case, to induce a confession." State v. Harper, 485 So.2d 224, 225 (La.App. 2d Cir.1986). [emphasis original.]
In State v. Lewis, the Court considered the impact of statements elicited by the state during plea negotiations which took place in Rapides Parish, where the defendant was charged in both Avoyelles Parish and Rapides Parish and he apparently believed that he was being offered immunity in both parishes when he reached an agreement with the district attorney of Rapides Parish. Analogizing the plea negotiations to a civil contract (an analysis the Court first adopted in State v. Nall, 379 So.2d 731 (La.1980)), the Court concluded that the agreement was void because both parties apparently were mistaken as to what was to be exchanged in the contract; and, since the defendant had provided the inculpatory statements in the belief that the evidence could not be used against him, the statements were not "voluntary" or admissible in either parish. The Court set forth the appropriate analysis, as follows:

*1333 In determining whether defendant's statement was given voluntarily, the `totality of the circumstances' inquiry requires the reviewing court to investigate and analyze `both the characteristics of the accused and the details of the interrogation.' United States v. Grant, 622 F.2d 308, 316 (8th Cir.1980) (citations omitted). Based upon a complete review of all relevant considerations on the issue of voluntariness, the ultimate question must be answered of whether the statement was `the product of an essentially free and unconstrained choice' or the result of an overborne will. Id. at 316-317 (citations omitted).
539 So.2d at 1205.
During the hearing outside of the jury's presence to establish the voluntariness of the statements, Captain Connor testified that, after the Hankersons and Greg Green were transported to the sheriff's station, they were isolated and questioned separately. After ascertaining that the stories differed, he confronted the parties with the inconsistencies; and ultimately Johnnie Hankerson elected to initiate some type of interchange and the brothers confessed. The court questioned Captain Connor about his response to the offer, as follows:
Johnnie says the guy wefirst when he was telling about this dope he says you don't understand. He said the guy I got this dope fromthe only way I can prove it to you is through this man, and he'll kill me; these are serious people. So we're still talking about the cocaine that we busted him for. At the point where he starts telling me this case, I said, Johnnie, when I know that you've been straight about what we're doing here today, not about 2000 kilos you think you can get because I don't believe a word you're saying until you prove otherwise. You're going to prove to me where this dope came from, how you got it, how much you paid for it, how you transported it. When you've done that, then we'll talk about the rest of it. He said I can do it. I'm telling you I can give you one you never got in Baton Rouge.
* * * * * *
While he's still trying to explain this, and I'm telling him you can sit on that because I don't believe it. That's when I bring him back to this. I mean what am IJudge, I already know he's lied to me. I'm trying to give you my understanding so you'll understand. I know he's lied. He's really got to convince me that he's told me the truth about this. If he's not going to be truthful about this, I'm not going to get narcotics agents involved in fifty kilos of cocaine.
THE COURT: All right, all I'm interested in though is at what point the conversation turned to some other deal and who suggested that.
A. Johnnie indicated that he could turn it
THE COURT: Why?
A. For a deal, for help. He said I can do this, and I said, Johnnie, we're not going to discuss that until I know what we've got right here.
Later, Captain Connor addressed the Hankerson's decision to discuss the cocaine, as follows:
A. ... So they were clear on the fact that they would get a substantial assistance letter. As far as sentencing or any of that, that it was up to the district attorney and the judge.
Q. Was this arrangement explained to them, or did they enter into this arrangement before, during or after their confession?
A. Before.
Q. And at what point in timeat what point in time did they then enter into this arrangement with you for substantial cooperation?
A. They initially gave a story as they were separated that differed in each one of them blaming it on the other one, and Greg Green trying to blame it on them, and them trying to blame it on Greg Green, and that as they told the story we would talk to the other one, and it wasn't long before we made it clear to them that all of them were telling a different story. *1334 And it was at this time Johnnie said, all right, and he said, ifif I run the deal down to you and if I can lead to a large seizure of cocaine, he said, what would you consider to be large? And I said, Johnnie, I don't know. What can you do? So I threw out a figure of fifty kilosat that time. As he explained it, I explained the substantial assistance letter to him, and the whole nine yards.
* * * * * *
Q. Did you offer them anything at all for their confession?
A. No, sir.
Q. Well, how about this deal you told us about, this agreement of cooperation?
A. That if it resultedif they did cooperate, that they would get a letter, but that was if they cooperated and it resulted in arrest and seizure, which it did not.
Q. Did they appear to understand the differences between the cooperation in terms of a confession and cooperation in terms of making future and subsequent arrests?
A. The future or the proposed drug deal was when they had counsel. The others were explained to themtheir rights per Miranda were explained to them. They fully waived those rights and understood those rights, confessed the entire incident, and then we negotiated with counsel and with the district attorney's office for this future drug deal. So it was actually two parts.
Q. Okay.
A. Also, I couldn't do the future drug deal or have knowledge of how to put it together for them to even explain it to me if they had not confessed the other crime first.
Thus, Captain Connor's testimony clearly reflects that he first advanced the proposal that the brothers confess; and, in fact, he required the defendant to confess to this crime as a predicate for entering into an alliance to set up a future transaction; and defendant's successful participation in that scheme, in turn, would result in a "substantial benefit" letter to impact the sentence he could receive in this case. We find no valid reason why the interposition of the future transaction should detract from the basic scheme: Captain Connor did not offer to make defendant's cooperation known to the sentencing judge, a legitimate suggestion which does not constitute an inducement; he required a confession in return for future assistance with the sentence. Such actions, on his part, render the statements made in response to that requirement the inadmissible product of unlawful inducement.[1]
After concluding that the statements were the product of illegal inducements, this Court has reviewed the circumstances to determine whether or not the admission of the statements could have been harmless error with reference to this defendant. See, e.g., Arizona v. Fulminante, ___ U.S. ___, 111 S.Ct. 1246, 113 L.Ed.2d 302 (1991). We conclude that the erroneous admission of the statements was not harmless.
In order to establish that the error was harmless, it must be determined whether or not the state has met its burden of demonstrating that the admission of the confession did not contribute to defendant's conviction. See Arizona v. Fulminante, ___ U.S. at ___, 111 S.Ct. at 1257, 113 L.Ed.2d at 322. Herein, other evidence tied defendant to the cocaine. Nevertheless, we are not persuaded that the remaining evidence was so strong that the introduction of the confession could be considered merely cumulative evidence of guilt.
Although defendant unquestionably was present in the residence from which concaine was distributed, other evidence suggested that a number of other people either *1335 lived in or had free access to the house as a whole. Defendant did not live in the residence, and he had only recently arrived from Florida, ostensibly to visit his family at his mother's urging.
It has long been recognized that the impact of a defendant's confession upon a jury is exceptionally persuasive. Herein, the state's evidence essentially established only that defendant was present in the house under circumstances which would make it difficult to infer that he was not aware that contraband was present. Accordingly, we cannot find that the improperly admitted confessions could not have contributed to the verdict; and, therefore, we cannot conclude that the introduction of the statements was harmless error. Accordingly, defendant's conviction is reversed; and this matter is remanded for further proceedings.
REVERSED AND REMANDED FOR A NEW TRIAL.
NOTES
[1] Although some of the details were revealed after the Hankersons had been permitted to consult with an attorney, who apparently advised them to cooperate with the investigators, Captain Connor testified that he suggested that the brothers contact an attorney because of the extent of the proposed transaction. However, by the time they consulted with counsel, the Hankersons had already divulged the method by which they had obtained the cocaine for which they were arrested; and, therefore, the statements clearly were not the product of counsel's advice to cooperate.