604 So.2d 1323 (1992)
STATE of Louisiana
v.
Gregory HANKERSON.
No. KA 91 0478.
Court of Appeal of Louisiana, First Circuit.
May 22, 1992.
Rehearing Denied October 8, 1992.
Doug Moreau, Dist. Atty. by Robert Piedrahita, Dan Grady, Asst. Dist. Attys., Baton Rouge, for plaintiff/appellee.
Robert Glass, New Orleans, for defendant/appellant.
Before LANIER, CRAIN, and GONZALES, JJ.
CRAIN, Judge.
Defendant, Gregory Hankerson, was charged by bill of information with one count of conspiracy to distribute cocaine of an amount equal to or greater than 200 grams but less than 400 grams, in violation of La.R.S. 14:26, 40:964 and 40:967 A; and possession of cocaine of an amount equal to or greater than 200 grams but less than 400 grams, in violation of La.R.S. 40:964 and 40:967 F. He was tried by a jury, which convicted him as charged. The trial court imposed a sentence of twelve years at hard labor, with credit for time served, for the conspiracy conviction; and a concurrent *1324 term of twelve years at hard labor, with credit for time served, for the conviction of possession of cocaine. The court further ordered that the sentence for possession of cocaine was to be served without benefit of probation or parole for five years. Defendant appealed, urging ten assignments of error.
Defendant has presented only one argument on appeal, which relates to his claim that statements made after his arrest were inadmissible. That claim could be addressed to any one of a number of the designated errors, and defendant has failed to specify which error or errors are at issue. However, since the brief is almost exclusively devoted to defendant's claim that the statements were inadmissible because they were offered during the context of plea negotiations and were induced by the state's promises of future assistance, we have considered defendant's argument as relating to the second assigned error, directed to a claim that the statements were induced, and the sixth assigned error, in which defendant raises the plea negotiations issue. The remaining assignments of error are considered abandoned. Uniform RulesCourts of Appeal, Rule 2-12.4.
Defendant was jointly charged with his brothers, Bradford and Johnnie Hankerson. The charges against Bradford Hankerson were dismissed prior to trial. Johnnie Hankerson and defendant were tried together. Johnnie also was convicted as charged, and he separately appealed. See KA 91 0479, 604 So.2d 1330, also decided this date.
The charges were instituted after a search of the Hankersons' Baton Rouge residence resulted in the discovery of nearly one and one-half pounds of a cocaine mixture. Most of the contraband was located in a dresser drawer in a bedroom defendant shared with his (Hankerson's) girlfriend and another individual named Greg Green. Twenty-five packets (totalling approximately twenty-two ounces) were recovered from the dresser. At the time of his arrest, an additional one ounce packet of cocaine was discovered in a pocket of defendant's clothing. Tests revealed that each of the packets was approximately 50% pure cocaine (mixed with a quantity of inositol, a substance commonly used to dilute cocaine.) The total weight of the pure cocaine seized during the search was 299.1 grams. Two empty bottles that had contained inositol, three putty knives, and a number of plastic bags also were found in the bedroom. Elsewhere in the house, agents found a notebook suggesting an extensive distribution scheme, a scale, more plastic bags, and a razor.
The search was conducted pursuant to a warrant obtained after a confidential informant made a purchase from a distributor identified as "Greg." The "controlled buy" occurred in the Hankersons' residence on the same day that the warrant was executed, and it was monitored and taped through the use of electronic surveillance equipment. The "Greg" who participated in the controlled buy was later identified as defendant. Another suspect, Greg Green, was arrested when he came to the house after the Hankersons and two female acquaintances present in the house during the execution of the warrant had been apprehended. Greg Green and Gregory Hankerson apparently shared the bedroom where the cocaine was found. Green also had a small amount of cocaine on his person when he was arrested.
After his arrest, defendant admitted that the cocaine found in the pocket belonged to him; however, both brothers initially disavowed knowledge of the cocaine in the bedroom. Later, they gave a statement in which they admitted that defendant and Johnnie Hankerson (who apparently was living with his mother in Fort Lauderdale, Florida, and not with his brothers in Baton Rouge) had procured the cocaine in Florida and had it transported to Baton Rouge by another individual. The brothers offered to arrange a large transaction in order to obtain a letter confirming their assistance to law enforcement officers. Although the state agreed to this arrangement (and a letter ultimately was sent to the trial court, outlining the extent of cooperation by the Hankersons), the brokerage agreement was terminated on the advice of the Hankersons' attorney and was never completed.
*1325 Defendant testified at trial, and he disclaimed all knowledge of the cocaine. Defendant further related that the slacks he was wearing at the time of the arrest (in which one ounce of cocaine was found) actually belonged to Greg Green, with whom he also shared the dresser in which the remaining cocaine was found. Finally, defendant claimed that he had not made the statements attributable to him.

ADMISSIBILITY OF STATEMENTS
Defendant claims that the trial court erred by permitting the state to introduce admissions made by him and his brother, Johnnie, to Captain Don (Bud) Connor at the Sheriff's department office. He claims the statements were inadmissible because they were made after the onset of negotiations between Captain Connor and the brothers for a "substantial assistance" letter, which could favorably influence the trial court with regard to sentence in the event the brothers were convicted. Defendant further claims that the state used the inducement of the "substantial assistance" letter in order to obtain the confessions.
Captain Connor interviewed the Hankerson brothers shortly after they were booked. He read them the statute under which they would be charged, including the penalty (which provides that the sentencing court can impose a term making the accused probation or parole eligible only if the state certifies that the accused has rendered substantial assistance to law enforcement officers.) After the Hankersons expressed an interest in arranging for a large delivery of cocaine, Captain Connor advised them that an arrangement of that nature could be made only if the brothers first confessed to the charges for which they were arrested. He obtained an attorney for them; and, after consultation with counsel in which defendant apparently was advised to cooperate, defendant agreed to the terms required by Captain Connor and revealed detailed information concerning the source of the cocaine at issue and the method of its procurement.
In light of the sentencing provisions herein at issue, which provide the sentencing court with the discretion to impose a term with probation or parole eligibility only "if it finds the defendant rendered such substantial assistance", defendant's claim that Captain Connor's offer to provide the substantial assistance letter elevated the discussions of future cooperation to the level of plea bargaining has potential merit. However, because we find that Captain Connor's conduct constituted an inducement for the confession, we find it unnecessary to discuss defendant's claim that the statements were inadmissible under L.C.E. art. 410[1].
"It is well settled that confessions obtained by `any direct or implied promises, however slight, [or] by the exertion of any improper influence, are involuntary and inadmissible as a matter of constitutional law.'" State v. Jackson, 414 So.2d 310, 312 (La.1982), quoting Bram v. United States, 168 U.S. 532, 542-543, 18 S.Ct. 183, 187, 42 L.Ed. 568, 573 (1897). When the state seeks to introduce into evidence an inculpatory statement, it has the burden of establishing beyond a reasonable doubt that the statement was made freely and voluntarily and not under the influence of fear, duress, intimidation, menaces, threats, inducements or promises. La.R.S. 15:451; State v. Jackson, supra.
"The admissibility of a confession is in the first instance a question for the trial judge and his conclusions on the credibility *1326 and weight of the testimony relating to the voluntary nature of the statement will not be overturned unless they are not supported by the evidence." State v. Jackson, 414 So.2d at 312. "However, a reviewing court cannot avoid its responsibility to examine the record to be certain that the State has fully borne its heavy burden of proof in these cases." State v. Peters, 315 So.2d 678, 681 (La.1975). "[A] review of the totality of the circumstances under which the statement was given is still required and any inducement offered to the defendant is but one fact, albeit an important one, in that analysis." State v. Lewis, 539 So.2d 1199, 1201-1202 (La.1989), quoting United States v. Long, 852 F.2d 975, 977 (7th Cir.1988). "The state of mind of the defendant and the interrogating officer are highly relevant to resolution of the issue whether the inducement or promise was calculated, under the circumstances of the particular case, to induce a confession." State v. Harper, 485 So.2d 224, 225 (La.App. 2d Cir.1986). [emphasis original.]
In State v. Lewis, the Court considered the impact of statements elicited by the state during plea negotiations which took place in Rapides Parish, where the defendant was charged in both Avoyelles Parish and Rapides Parish and he apparently believed that he was being offered immunity in both parishes when he reached an agreement with the district attorney of Rapides Parish. Analogizing the plea negotiations to a civil contract (an analysis the Court first adopted in State v. Nall, 379 So.2d 731 (La.1980)), the Court concluded that the agreement was void because both parties apparently were mistaken as to what was to be exchanged in the contract; and, since the defendant had provided the inculpatory statements in the belief that the evidence could not be used against him, the statements were not "voluntary" or admissible in either parish. The Court set forth the appropriate analysis as follows:
In determining whether defendant's statement was given voluntarily, the `totality of the circumstances' inquiry requires the reviewing court to investigate and analyze `both the characteristics of the accused and the details of the interrogation.' United States v. Grant, 622 F.2d 308, 316 (8th Cir.1980) (citations omitted). Based upon a complete review of all relevant considerations on the issue of voluntariness, the ultimate question must be answered of whether the statement was `the product of an essentially free and unconstrained choice' or the result of an overborne will. Id. at 316-317 (citations omitted).
539 So.2d at 1205.
During the hearing outside of the jury's presence to establish the voluntariness of the statements, Captain Connor testified that, after the Hankersons and Greg Green were transported to the sheriff's station, they were isolated and questioned separately. After ascertaining that the stories differed, he confronted the parties with the inconsistencies; and ultimately Johnnie Hankerson elected to initiate some type of interchange and the brothers confessed. The court questioned Captain Connor about his response to that decision, as follows:
Johnnie says the guy wefirst when he was telling about this dope he says you don't understand. He said the guy I got this dope fromthe only way I can prove it to you is through this man, and he'll kill me; these are serious people. So we're still talking about the cocaine that we busted him for. At the point where he starts telling me this case, I said, Johnnie, when I know that you've been straight about what we're doing here today, not about 2000 kilos you think you can get because I don't believe a word you're saying until you prove otherwise. You're going to prove to me where this dope came from, how you got it, how much you paid for it, how you transported it. When you've done that, then we'll talk about the rest of it. He said I can do it. I'm telling you I can give you one you never got in Baton Rouge.
* * * * * *
While he's still trying to explain this, and I'm telling him you can sit on that because I don't believe it. That's when I bring him back to this. I mean what am IJudge, I already know he's lied to me.
*1327 I'm trying to give you my understanding so you'll understand. I know he's lied. He's really got to convince me that he's told me the truth about this. If he's not going to be truthful about this, I'm not going to get narcotics agents involved in fifty kilos of cocaine.
THE COURT: All right, all I'm interested in though is at what point the conversation turned to some other deal and who suggested that.
A. Johnnie indicated that he could turn it
THE COURT: Why?
A. For a deal, for help. He said I can do this, and I said, Johnnie, we're not going to discuss that until I know what we've got right here.
Later, Captain Connor addressed the Hankerson's decision to discuss the cocaine, as follows:
A. ... So they were clear on the fact that they would get a substantial assistance letter. As far as sentencing or any of that, that it was up to the district attorney and the judge.
Q. Was this arrangement explained to them, or did they enter into this arrangement before, during or after their confession?
A. Before.
Q. And at what point in timeat what point in time did they then enter into this arrangement with you for substantial cooperation?
A. They initially gave a story as they were separated that differed in each one of them blaming it on the other one, and Greg Green trying to blame it on them, and them trying to blame it on Greg Green, and that as they told the story we would talk to the other one, and it wasn't long before we made it clear to them that all of them were telling a different story. And it was at this time Johnnie said, all right, and he said, ifif I run the deal down to you and if I can lead to a large seizure of cocaine, he said, what would you consider to be large? And I said, Johnnie, I don't know. What can you do? So I threw out a figure of fifty kilosat that time. As he explained it, I explained the substantial assistance letter to him, and the whole nine yards.
* * * * * *
Q. Did you offer them anything at all for their confession?
A. No, sir.
Q. Well, how about this deal you told us about, this agreement of cooperation?
A. That if it resultedif they did cooperate, that they would get a letter, but that was if they cooperated and it resulted in arrest and seizure, which it did not.
Q. Did they appear to understand the differences between the cooperation in terms of a confession and cooperation in terms of making future and subsequent arrests?
A. The future or the proposed drug deal was when they had counsel. The others were explained to themtheir rights per Miranda were explained to them. They fully waived those rights and understood those rights, confessed the entire incident, and then we negotiated with counsel and with the district attorney's office for this future drug deal. So it was actually two parts.
Q. Okay.
A. Also, I couldn't do the future drug deal or have knowledge of how to put it together for them to even explain it to me if they had not confessed the other crime first.
Thus, Captain Connor's testimony clearly reflects that he first advanced the proposal that the brothers confess; and, in fact, he required the defendant to confess to this crime as a predicate for entering into an alliance to set up a future transaction; and defendant's successful participation in that scheme, in turn, would result in a "substantial benefit" letter to impact the sentence he could receive in this case. We find no valid reason why the interposition of the future transaction should detract from the basic scheme: Captain Connor did not offer to make defendant's cooperation known to the sentencing judge, a legitimate suggestion which does not constitute an inducement; he required a confession in return for future assistance with the sentence. *1328 Such actions, on his part, render the statements made in response to that requirement the inadmissible product of unlawful inducement.[2]
Although we have determined that the statements were the product of illegal inducements, the conviction need not be reversed if the erroneous admission of the statements constituted harmless error. See Arizona v. Fulminante, ___ U.S. ___, 111 S.Ct. 1246, 113 L.Ed.2d 302 (1991). Herein, in light of the circumstances set forth below, we find that the error was harmless beyond a reasonable doubt as to this defendant.
In Arizona v. Fulminante, a majority of the United States Supreme Court concluded that even the introduction of a coerced confession can be harmless. In order to determine if the admission of the confession was reversible error, the reviewing court may conduct a de novo review of the record in order to ascertain whether the State met its burden of demonstrating that the admission of the confession did not contribute to the defendant's conviction. ___ U.S. at ___, 111 S.Ct. at 1257, 113 L.Ed.2d at 322.[3]
Although the Court ultimately determined that the introduction of the statement was not harmless, the opinion set forth two categories of error: structural defects, which cannot be subjected to a harmless error analysis; and trial error, such as the improper introduction of evidence, which may be harmless in certain circumstances. The Court defined "trial error" as follows:
error which occurred during the presentation of the case to the jury, and which may therefore be quantitatively assessed in the context of other evidence presented in order to determine whether its admission was harmless beyond a reasonable doubt.
111 S.Ct. at 1264.
Thereafter, in Yates v. Evatt, ___ U.S. ___, 111 S.Ct. 1884, 114 L.Ed.2d 432 (1991), the Court generally reviewed the harmless error standards set forth in Chapman v. California, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967); Arizona v. Fulminante; and Delaware v. Van Arsdall, 475 U.S. 673, 106 S.Ct. 1431, 89 L.Ed.2d 674 (1986), concluding as follows:
To say that an error did not "contribute" to the ensuing verdict is not, of course, to say that the jury was totally unaware of that feature of the trial later held to have been erroneous.
When, for example, a trial court has instructed a jury to apply an unconstitutional presumption, a reviewing court can hardly infer that the jurors failed to consider it, a conclusion that would be factually untenable in most cases, and would run counter to a sound presumption of appellate practice, that jurors are reasonable and generally follow the instructions they are given. See Richardson v. Marsh, 481 U.S. 200, 211, 107 S.Ct. 1702, 1709, 95 L.Ed.2d 176 (1987) ("rule that juries are presumed to follow their instructions is a pragmatic one, rooted less in the absolute certitude that the presumption is true than in the belief that it *1329 represents a reasonable practical accommodation of the interests of the state and the defendant").
To say that an error did not contribute to the verdict is, rather, to find that error unimportant in relation to everything else the jury considered on the issue in question, as revealed in the record.
111 S.Ct. at 1893.
The specific error at issue in Yates v. Evatt was the effect of an improper jury instruction. Nevertheless, in light of the conclusion in Fulminante that trial error "may be quantitatively assessed in the context of other evidence presented in order to determine whether its admission was harmless beyond a reasonable doubt" we conclude that the primary focus of the reviewing court should be on the adequacy of the other legally admitted evidence, although other factors also may affect the harmless error analysis.
Herein, the record reflects that several hours before the search warrant was executed, law enforcement agents monitored a sale of cocaine to a confidential informant by a person in that house identified as "Greg." A tape recording of that transaction was introduced into evidence and played for the jury, and the "Greg" who made the sale (and who introduced his brother, Johnnie, to the informant) was identified as defendant.
Defendant was searched soon after officers arrived to execute the warrant; and, at that time, approximately one ounce of cocaine was found in the pocket of the trousers he was wearing. Although he recanted the statement at trial, defendant admitted during the search that the cocaine in his pocket belonged to him. A substantial quantity of cocaine was found in the northeast bedroom of the residence, and defendant admitted at trial that the bedroom was his. An address book, a notebook, some envelopes addressed to Gregory Hankerson at that address, and various drug paraphernalia also were found in that bedroom. The notebook, introduced as State Exhibit 28, listed defendant's name as the owner and his mother as the person to notify in the event of an emergency.[4] Other drug paraphernalia, including scales, packaging equipment, and a substance commonly used to dilute cocaine were found openly in the house.
*1330 Defendant claimed that he shared the bedroom where the cocaine was found, as well as the dresser in which it was located, with Greg Green and Green's girlfriend. Despite his statement at the time of the search that the cocaine found in the pocket of his trousers belonged to him, defendant later claimed that the slacks and presumably the cocaine belonged to Greg Green. Unquestionably, the evidence against defendant was quite strong. His defense at trial, that a number of other persons had access to his bedroom and could have placed the cocaine in his dresser, was simply incredible in light of the other evidence inculpating him. Moreover, both defendant and his brother testified at trial, claiming that the police had fabricated the statement at issue. The jury clearly elected not to believe that testimony.
Accordingly, we conclude that the admission of the statement did not contribute to the verdict herein, which was strongly supported by other evidence and influenced by the jury's conclusion that defendant was not a credible witness. Therefore, we find that the introduction of the statements, although improper, was harmless error as to defendant; and his conviction and sentence are affirmed.
CONVICTION AND SENTENCE AFFIRMED.
NOTES
[1] L.C.E. art. 410 provides as follows:

A. General rule. Except as otherwise provided in this Article, evidence of the following is not, in any civil or criminal proceeding, admissible against the party who made the plea or was a participant in the plea discussions:
* * * * * *
(4) Any statement made in the course of plea discussions with an attorney for or other representative of the prosecuting authority which do not result in a plea of guilty or which result in a plea of guilty later withdrawn or set aside.
[2] Although some of the details were revealed after the Hankersons had been permitted to consult with an attorney, who apparently advised them to cooperate with the investigators, Captain Connor testified that he suggested that the brothers contact an attorney because of the extent of the proposed transaction. However, by the time they consulted with counsel, the Hankersons had already divulged the method by which they had obtained the cocaine for which they were arrested; and, therefore, the statements clearly were not the product of counsel's advice to cooperate.
[3] Thereafter, in State v. Cage, 583 So.2d 1125 (La.), cert. den., ___ U.S. ___, 112 S.Ct. 211, 116 L.Ed.2d 170 (1991), the Louisiana Supreme Court adopted the analysis of Arizona v. Fulminante by finding that the use of improper jury instructions is a trial error which can be subjected to a harmless error analysis. The specific issue considered herein, whether or not the introduction of an involuntary confession can be harmless error, has not been considered by the Louisiana Supreme Court at this time. However, prior to the rendition of Arizona v. Fulminante, the Court applied a harmless error analysis to the erroneous introduction of a confession that was voluntary but taken in violation of the accused's Miranda rights. See State v. Lee, 524 So.2d 1176 (La.1987), on rehearing (La.1988), in which the Court concluded that the introduction of the confession was harmless error with regard to the guilt phase of a capital murder trial, but found, on rehearing, that it was reversible error with respect to the penalty phase.
[4] The notebook contains several notations apparently concerning transactions conducted involving grams or a portion of a gram, such as the following:

RANCE 150 45 g
MICHELE 150
TOD 150 13 - 500
LONNIE 100 7 - 250
GREG 25 6 - 250
JED 40 6 - 250
 ___
 565 8 - 150
 8 - 175 500
I DOPE 45 GRAMS 1/6 - 75 70
MONEY 370 1/6 - 75 130
 ____
WILL PAY 165 1/6 - 75 700
 ____
TOTAL 535 1/6 - 75
 - 6 - 40
TOTAL 45 GRAMS ½ - 30
 500
 TOTAL = 2,200
 400 MONEY = 370
 500 OWE = 165
 _____
 500 TOTAL = 2,735
 _____
 1,400 700
 _____
 2,035

On rebuttal, Captain Connor was asked to review this exhibit and the figures contained therein. He testified that the units listed in the notebook, of which the schedules listed above are illustrative, are the same units in which cocaine is commonly distributed.
Undoubtedly, there are a number of possible explanations for these notations. However, especially in light of the entry labelled "I-DOPE", measured in units in which cocaine is commonly distributed, this notebook is strong circumstantial evidence that defendant was actively involved in brokering cocaine and thus tends to establish his guilt in the instant offense.