625 So.2d 1364 (1993)
STATE of Louisiana
v.
Kermit PARKER.
No. 92 KA 2027.
Court of Appeal of Louisiana, First Circuit.
October 15, 1993.
*1366 Doug Moreau, Dist. Atty., Office of Dist. Atty., Baton Rouge, by Premila Burns, Asst. Dist. Atty., for plaintiff/appellee.
Office of Public Defender, Baton Rouge, for defendant/appellant.
Before EDWARDS, CRAIN and LeBLANC, JJ.
CRAIN, Judge.
The defendant, Kermit Parker, was originally charged by grand jury indictment with second degree murder, in violation of LSA-R.S. 14:30.1. However, this indictment was nol-prossed. Subsequently, the defendant was reindicted for first degree murder, in violation of LSA-R.S. 14:30. His first trial ended in a mistrial when the jury was unable to agree upon a verdict. Immediately prior to the beginning of the second trial, the prosecutor amended the indictment to charge second degree murder, and the defendant pled not guilty. At the conclusion of the second trial, the defendant was found guilty as charged by a unanimous jury. The defendant received the mandatory sentence of life imprisonment at hard labor, without benefit of parole, probation, or suspension of sentence.[1] He has appealed, alleging thirty-nine assignments of error.
Assignments of error numbers 4, 8, 10-35, and 37 were not briefed on appeal and, therefore, are considered abandoned. Uniform RulesCourts of Appeal, Rule 2-12.4.

FACTS
On the morning of June 21, 1988, the defendant and Damien Lundy decided to commit a burglary in the Goodwood Homesites Subdivision, an area in which they previously had committed at least two burglaries. They rode bicycles to a business located near the subdivision. They parked the bicycles and entered the subdivision on foot, looking for a house which appeared to be unoccupied. When they found one, they would approach it and knock on the door or ring the doorbell. If someone came to the door, they would ask for some yard work or make up an excuse about looking for someone.
A subdivision resident who encountered the defendant and Lundy became suspicious when they asked for yard work but did not have any tools or equipment with them. As she drove through the neighborhood, she observed a motorcycle policeman, Baton Rouge City Police Sergeant Warren Broussard, and reported this suspicious activity to him. Sgt. Broussard assured her that he would investigate. He located the defendant and Lundy as they were attempting to burglarize the *1367 residence located at 1036 Landwood Drive. Sgt. Broussard parked his motorcycle in the driveway and motioned for the defendant and Lundy to approach him. As he asked them for some identification, Lundy began asking questions in order to distract him. Sgt. Broussard conducted a brief patdown search of the defendant and felt a gun. The defendant immediately pulled the gun out of his pocket and threw it in the grass. As Sgt. Broussard called for backup on his police radio, he informed the defendant and Lundy that they were going to be arrested. At that point, the defendant produced a second gun and told Sgt. Broussard to "freeze." When Sgt. Broussard tried to pull his own gun, the defendant shot him in the stomach. Lundy immediately fled the scene after this first shot. As Sgt. Broussard bent over in pain, the defendant fired a second, fatal shot, striking Sgt. Broussard in the head. The defendant ran a short distance but returned to pick up the first gun. As he fled from the scene of the shooting, the defendant unsuccessfully attempted to commandeer a vehicle driven by an elderly woman. He then fled the subdivision on foot and was apprehended as he exited a drainage canal bordering the subdivision. The defendant claimed to have witnessed the shooting as an innocent bystander and then to have chased the perpetrators, losing them in the drainage canal.
Both the defendant and Lundy had removed outer clothing as they fled from the crime scene. Although Lundy managed to safely return home, he was subsequently arrested after his fingerprints were found on a pair of sunglasses located with his abandoned clothing and on the bicycle which he had left parked at the business near the subdivision.
Although the defendant's social security card had been found on the ground next to the victim's body, false statements by the defendant, a positive gunshot residue test, and an erroneous lineup identification by one of the eyewitnesses to the shooting had resulted in Michael Carter becoming the primary suspect in the case. Both Lundy and the defendant, who had been offered immunity from prosecution in exchange for cooperation in the investigation, falsely accused Carter before a grand jury. After his release from jail, however, the defendant admitted to Linda Smith that he had shot and killed the victim. Subsequently, due to numerous conflicting pieces of evidence in the case, the police reopened their investigation of the shooting, eventually cleared Carter, and refocused their investigation upon the defendant, who was later rearrested and indicted for the instant offense.
ASSIGNMENTS OF ERROR NOS. ONE, TWO, AND FIVE:
In these assignments of error, the defendant contends that the trial court erred in denying his motions to quash the indictment. The defendant contends that, since he was promised immunity from prosecution in exchange for his cooperation, the State should not have been allowed to unilaterally revoke the grant of immunity and indict him on the instant charge.
The defendant was originally indicted for second degree murder. The case was allotted to Judge Freddie Pitcher. The defendant filed a motion to quash this indictment based upon the grant of immunity. After a hearing on July 27, 1990, Judge Pitcher took the matter under advisement. On August 27, 1990, Judge Pitcher denied the motion to quash but ruled that he would probably suppress statements given by the defendant prior to the revocation of immunity. Thereafter, the defendant filed a second motion to quash. The State filed a motion to reconsider the ruling on the motion to suppress statements. A hearing was held on these motions on October 30 and 31, 1990. At the conclusion of this hearing, Judge Pitcher again denied the motion to quash. However, he recalled his previous ruling suppressing the defendant's statements and concluded that the statements would be admissible at trial.
After the original indictment was nol-prossed and the defendant was reindicted for first degree murder, Judge Pitcher recused himself. The defendant filed a third motion to quash the indictment and a second motion to suppress statements given while the immunity agreement was in effect. A hearing on these motions was held on September 10, 1991, before Judge J. Michael McDonald. At the conclusion of this hearing, finding no *1368 error in the prior rulings, the trial court denied both motions.
In his brief to this Court, the defendant contends that a motion to quash was the correct procedural vehicle to challenge an indictment returned in violation of a grant of immunity. The defendant notes that there are two types of immunity, transactional immunity and use plus derivative use immunity. Transactional immunity is broader because it affords complete immunity from prosecution on the charged offense. Use plus derivative use immunity still allows for prosecution on the charge, provided that the State cannot "use" evidence provided by the defendant as a result of the immunity agreement, or any information "derived" therefrom. The defendant concludes that, since the State did not attempt to comply with the requirements of La.C.Cr.P. art. 439.1, he was given transactional immunity and, therefore, he could not be prosecuted for the instant offense.
La.C.Cr.P. art. 439.1 provides:
A. In the case of any individual who has been or may be called to testify or provide other information at any proceeding before or ancillary to a grand jury of the state, at any proceeding before a court of this state, or in response to any subpoena by the attorney general or district attorney, the judicial district court of the district in which the proceeding is or may be held shall issue, in accordance with Subsection B of this article, upon the request of the attorney general together with the district attorney for such district, an order requiring such individual to give testimony or provide other information which he refuses to give or provide on the basis of his privilege against self-incrimination, such order to become effective as provided in Subsection C of this article.
B. The attorney general together with the district attorney may request an order under Subsection A of this article when in his judgment
(1) the testimony or other information from such individual may be necessary to the public interest; and
(2) such individual has refused or is likely to refuse to testify or provide other information on the basis of his privilege against self incrimination (sic).
C. The witness may not refuse to comply with the order on the basis of his privilege against self incrimination (sic), but no testimony or other information compelled under the order, or any information directly or indirectly derived from such testimony or other information, may be used against the witness in any criminal case, except a prosecution for perjury, giving a false statement or otherwise failing to comply with the order.
D. Whoever refuses to comply with an order as hereinabove provided shall be adjudged in contempt of court and punished as provided by law.
This article appears to provide for use plus derivative use immunity. Since the State did not consult the attorney general or the district court prior to this offer of immunity, the defendant may be correct in his assertion that he was granted transactional immunity. See State v. Reed, 441 So.2d 1257, 1258-1259 (La.App. 1st Cir.1983), writ denied, 445 So.2d 1233 (La.1984). In our view, since transactional immunity would prevent any prosecution for the charged offense, a motion to quash would be the correct procedural vehicle to challenge an indictment which allegedly violated a grant of transactional immunity. On the other hand, if only use plus derivative use immunity was granted, we find that the correct procedure by which to challenge an indictment allegedly returned in violation of a grant of use plus derivative use immunity would be a motion to suppress any evidence obtained as a result of the grant of immunity, or any evidence derived directly or indirectly therefrom. In any event, for the reasons which follow, we find it unnecessary to decide which form of immunity was offered to the defendant or the correct procedural vehicle to challenge the revocation of immunity.
There is no doubt that, at the hearings on the motions to quash, it was definitely established that two conditions were placed upon the immunity agreement. Regardless of the type of immunity offered to the defendant, any such offer clearly was conditioned on the following: (1) the defendant must truthfully reveal to the police and *1369 the grand jury the details of the shooting; and (2) the defendant must not have been the triggerman. As will be noted more fully herein, the State proved that the defendant was the triggerman. Therefore, the immunity agreement was void from the beginning. Furthermore, the defendant gave false testimony against Michael Carter before the grand jury; and he gave several false, conflicting statements to the police wherein he named, at various times, Freddie Mills, Michael Carter, and Damien Lundy as the triggerman. Under these circumstances, the State was not bound by an immunity agreement when it indicted the defendant, and the rulings by Judge Pitcher and the trial court refusing to quash the indictment were correct.
These assignments of error are meritless.
ASSIGNMENTS OF ERROR NOS. THREE, SIX, AND THIRTY-SIX:
In these assignments of error, the defendant contends that the trial court erred in refusing to suppress two statements given under the grant of immunity and in allowing these statements to be introduced at trial. Specifically, the defendant refers to his videotaped statement of July 7, 1988 (State Exhibit 76), and his oral statement of March 27, 1989.
It is well-settled that for a confession or inculpatory statement to be admissible into evidence, the State must affirmatively show that it was freely and voluntarily given without influence of fear, duress, intimidation, menaces, threats, inducements, or promises. LSA-R.S. 15:451. The State must specifically rebut a defendant's specific allegations of police misconduct in eliciting a confession. State v. Thomas, 461 So.2d 1253, 1256 (La.App. 1st Cir.1984), writ denied, 464 So.2d 1375 (La.1985). Additionally, the State must show that an accused who makes a statement or confession during custodial interrogation was first advised of his Miranda rights. State v. King, 563 So.2d 449, 453 (La.App. 1st Cir.), writ denied, 567 So.2d 610 (La.1990).
The admissibility of a confession is, in the first instance, a question for the trial court; its conclusions on the credibility and weight of the testimony relating to the voluntary nature of the confession are accorded great weight and will not be overturned unless they are not supported by the evidence. See State v. Patterson, 572 So.2d 1144, 1150 (La.App. 1st Cir.1990), writ denied, 577 So.2d 11 (La.1991); State v. Sanford, 569 So.2d 147, 150 (La.App. 1st Cir.1990), writ denied, 623 So.2d 1299 (La.1993). Whether or not a showing of voluntariness has been made is analyzed on a case by case basis with regard to the facts and circumstances of each case. State v. Benoit, 440 So.2d 129, 131 (La.1983). The trial court must consider the totality of the circumstances in deciding whether or not a confession is admissible. State v. Hernandez, 432 So.2d 350, 352 (La.App. 1st Cir.1983).[2]
In the videotaped statement of July 7, 1988 (State Exhibit 76), the defendant claimed that he, Damien Lundy, and Michael Carter were present at the crime scene and that Carter was the triggerman. In his oral statement of March 27, 1989, the defendant again claimed that he, Lundy, and Carter were present at the crime scene and that Carter was the triggerman. However, when confronted by the police with the fact that their reopened investigation revealed there were only two perpetrators, the defendant omitted Carter and claimed that only he and Lundy were present and that Lundy was the triggerman.
The defendant does not make any allegations of police misconduct in obtaining these statements, nor does he argue that he was not given his Miranda rights. The defendant argues that these statements were inadmissible because they were given while under a grant of immunity. However, as noted in the previous assignments of error, the defendant violated both conditions of the immunity agreement, rendering it void from the beginning. The defendant further argues that, *1370 even if he did breach the immunity agreement, these two statements were given prior to the revocation of the immunity agreement and, therefore, should have been suppressed. He concludes that, because these two statements were given while the immunity agreement was still in effect, the statements were not voluntary and, therefore, were inadmissible at trial. In support of this proposition, the defendant primarily relies upon State v. Lewis, 539 So.2d 1199 (La.1989), and State v. Nall, 379 So.2d 731 (La.1980).
In Lewis, the defendant agreed to give information to the Rapides Parish District Attorney in exchange for an agreement to charge him with only one count of theft and to not use against him information which he gave relating to other offenses. Part of the agreement included the defendant also giving information to federal authorities concerning an arson investigation, which he apparently failed to do. However, some of the information given to the Rapides Parish District Attorney involved state criminal offenses committed in Avoyelles Parish, for which the defendant was ultimately charged. The defendant sought to suppress, in connection with the Avoyelles Parish prosecution, the use of any statements he made in connection with his agreement with the Rapides Parish District Attorney. The trial court denied the motion to suppress, and the Third Circuit Court of Appeal affirmed the trial court's ruling. In reversing, the Louisiana Supreme Court stated:
While defendant might have expected he could be subject to subsequent prosecution in another jurisdiction, this promise assured him that any evidence he gave would not be used against him. It is contrary to reason to believe he would have given evidence against himself had he believed such evidence could later be used against him. Instead, he gave evidence in exchange for the state's promise of immunity and, thus, the statements were not voluntary.
* * * * * *
Most significantly, the record shows defendant complied substantially with the terms of the plea bargain agreement. While he may have disappointed some of the expectations placed upon him, he did not disappoint all of them and he did not unilaterally withdraw from the agreement by entering a not guilty plea to the misdemeanor charge in Rapides Parish.
539 So.2d at 1205-1206.
In Nall, two men were arrested for murder. Nall entered into a plea bargain agreement with the prosecutor to testify against his co-defendant in exchange for the reduced charge of manslaughter and a ten year sentence. However, on April 30, 1979, Nall gave a statement about the offense which differed substantially from the statement upon which the plea bargain agreement had been reached. Thereafter, the prosecutor withdrew from the agreement. Nall filed a motion to suppress the April 30th statement, which the trial court granted. In affirming the trial court's ruling, the Louisiana Supreme Court stated:
The trial judge in this case properly ruled that the statement which defendant Nall gave on April 30 must be suppressed because undoubtedly, when defendant gave the statement, he did so with the belief that the district attorney would honor their agreement to reduce the charge to manslaughter and accept his guilty plea. Under these circumstances, the statement could not be viewed as voluntary. The information learned from the statement and any fruits of the information cannot be used in any subsequent prosecution of the defendant.
379 So.2d at 734.
The instant situation is distinguishable from both Nall and Lewis. Nall involved a plea bargain agreement, rather than a grant of immunity. Lewis involved both a plea bargain agreement and an apparent grant of immunitya plea bargain concerning offenses committed in Rapides Parish, and an apparent grant of immunity from prosecution for all other offenses to which the defendant confessed during the investigation of the Rapides Parish offenses. Nevertheless, Lewis "complied substantially" with the terms of his agreement, whereas the defendant herein never intended to comply with his agreement. In the instant case, we find that the defendant was not coerced or induced *1371 to make these two statements because of the promise of immunity, since he knew from the outset that the immunity agreement was void due to his violation of both conditions. We find that the defendant acted voluntarily in giving these two statements. In fact, his first attorney, Larry Dersona, approached the police and the prosecution indicating that the defendant wished to cooperate with the investigation, which eventually led to the conditional grant of immunity. Defendant intended from the beginning to attempt to gain advantage from prosecution by lying. It is to the credit of investigating and prosecuting authorities that they did not allow this to happen. The defendant should not be allowed to take advantage of his intentional attempt to mislead authorities.
In any event, even assuming that Lewis and/or Nall are controlling herein and, therefore, these two statements were inadmissible at trial and should have been suppressed, for the following reasons we find any such error in allowing these two statements to be introduced at trial was harmless beyond a reasonable doubt. See La.C.Cr.P. art. 921; State v. Hankerson, 604 So.2d 1323 (La.App. 1st Cir.1992), writ denied, 612 So.2d 78 (La.1993). In Arizona v. Fulminante, 499 U.S. 279, 111 S.Ct. 1246, 113 L.Ed.2d 302 (1991), a majority of the United States Supreme Court concluded that even the introduction of a coerced confession can be harmless error. In order to determine if the admission of the confession was reversible error, the reviewing court may conduct a de novo review of the record in order to ascertain whether or not the admission of the confession contributed to the defendant's conviction. 499 U.S. at 294-95, 111 S.Ct. at 1257.
As will be noted in our treatment of assignment of error number 39, the State proved beyond a reasonable doubt that the defendant shot and killed the victim. Even if these two statements had not been introduced into evidence, the remaining evidence still was sufficient to prove the defendant's guilt beyond a reasonable doubt. The co-perpetrator, Damien Lundy, testified at the trial in great detail concerning the important events which occurred before, during, and after the shooting. Lundy's testimony was largely consistent with the circumstantial evidence introduced at the trial. The physical evidence placed defendant at the scene. The statements given by defendant merely confirmed an overwhelmingly proved fact since in the statements defendant denied having committed murder. Finally, one of the strongest and most convincing pieces of evidence was the defendant's admission to the shooting after his release from jail, when he bragged to Linda Smith that he had shot and killed the victim. Accordingly, we conclude that the admission of these two statements, if erroneous, did not contribute to the unanimous guilty verdict herein, which was strongly supported by the circumstantial evidence, the defendant's admission of guilt to Ms. Smith, and the jury's obvious conclusion that Lundy was a credible witness.
For the above reasons, these assignments of error are meritless.
ASSIGNMENT OF ERROR NO. SEVEN:
In this assignment of error, the defendant contends that the trial court erred in allowing evidence of two prior crimes to be introduced at the trial. Specifically, the defendant argues that this evidence of other crimes should not have been admitted because the State failed to prove by clear and convincing evidence that he perpetrated these offenses.
Generally, evidence of criminal offenses other than the offense being tried is inadmissible as substantive evidence because of the substantial risk of grave prejudice to the defendant. State v. McDermitt, 406 So.2d 195, 200 (La.1981). In order to avoid the unfair inference that a defendant committed a particular crime simply because he is a person of criminal character, other crimes evidence is inadmissible unless it has an independent relevancy besides simply showing a criminal disposition. State v. Lafleur, 398 So.2d 1074, 1080 (La.1981).
La.Code of Evidence art. 404 B(1) provides:
Except as provided in Article 412, evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be *1372 admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake or accident, or when it relates to conduct that constitutes an integral part of the act or transaction that is the subject of the present proceeding.
At a pretrial Prieur hearing, the State introduced evidence that the defendant and Damien Lundy committed two burglaries in the Goodwood Homesites Subdivision less than two weeks before the instant offense. The first burglary occurred on June 10, 1988, at the home of Lois Thomas on Franwood Drive. The second burglary occurred on June 17, 1988, at the home of Peter Corona on Greenmoss Drive. The State contended that these two burglaries were relevant and admissible in the instant trial to prove motive. The defendant and Lundy were actually attempting to burglarize another residence in the Goodwood Homesites Subdivision at the time of the instant offense. When confronted by the victim, the defendant was in possession of stolen items taken during the two burglaries noted above. The jewelry he was wearing had come from the burglary of the Thomas residence, and the alleged murder weapon had come from the burglary of the Corona residence. The State argued that the defendant's possession of these stolen items provided a motive for the shooting. If the defendant had been arrested by the victim, he almost certainly would have been linked to these two prior burglaries because of his possession of these stolen items. Therefore, the defendant shot and killed the victim in order to avoid arrest and detection.
In order for the evidence of these two prior burglaries to be admissible, the State had to comply with the following requirements of State v. Prieur, 277 So.2d 126 (La. 1973):
(1) There must be clear and convincing evidence that the defendant committed these prior burglaries;
(2) The burglaries must be relevant for some other purpose than to show a probability that the defendant committed the instant offense because he is a man of criminal character;
(3) The prior burglaries tended to prove a material fact genuinely at issue;
(4) The probative value of the prior burglaries outweighed their prejudicial effect.
See State v. Brown, 398 So.2d 1381, 1384 (La.1981).[3] At the trial, the co-perpetrator, Damien Lundy, testified in great detail about how he and the defendant committed both of these burglaries. Lundy admitted that he and the defendant burglarized both the Thomas and Corona residences, and he listed the items taken during these burglaries. Although the defendant contends in his brief to this Court that Lundy's credibility is extremely suspect, the circumstantial evidence in this case strongly corroborates Lundy's testimony by linking the defendant with these two prior burglaries. Ms. Thomas identified the jewelry which the defendant was wearing at the time of his arrest shortly after the instant offense. She also identified some exotic snakeskin cowboy boots and a bicycle which were taken from her home during the burglary. These boots were recovered from the residence of the defendant's girlfriend, Geisha Pullet Tate. The bicycle, which Lundy rode on the day of the instant offense, was found at a business located near the scene of the instant offense. Lundy admitted that he and the defendant rode their bicycles on the morning of the instant offense. They parked them at this business and then walked into the subdivision looking for an unoccupied home to burglarize. Finally, Lundy testified that the defendant shot and killed the victim with a .38 Taurus revolver which was stolen from the Corona residence. Although the murder weapon was never found, the bullet recovered from the wound to the victim's stomach was matched to a box of .38 ammunition retrieved from the Corona residence.
Contrary to the defendant's argument, the State did prove by clear and convincing evidence that the defendant committed these two prior burglaries in the Goodwood Homesites Subdivision. The evidence of these two burglaries was relevant to prove the defendant's motive for killing the victim, as well as *1373 his identity. Accordingly, the trial court did not err in allowing this other crimes evidence to be admitted at the trial.
This assignment of error is meritless.
ASSIGNMENT OF ERROR NO. NINE:
In this assignment of error, the defendant contends that the trial court erred in permitting Baton Rouge City Police Chief Greg Phares to be exempted from sequestration as the State's representative.
The purpose of sequestration is to assure that a witness will testify as to his own knowledge of the events, to prevent the testimony of one witness from influencing the testimony of others, and to strengthen the role of cross-examination in developing facts. State v. Revere, 572 So.2d 117, 125 (La.App. 1st Cir.1990), writ denied, 581 So.2d 703 (La.1991). The resolution of sequestration problems is within the sound discretion of the trial court. State v. Ondek, 584 So.2d 282, 298 (La.App. 1st Cir.), writ denied, 586 So.2d 539 (La.1991). On appeal, the reviewing court will look at the facts of each case to determine whether or not a sequestration violation resulted in prejudice to the accused. State v. Lopez, 562 So.2d 1064, 1066 (La.App. 1st Cir.1990).
Louisiana Code of Evidence Article 615 provides, in pertinent part:
A. On its own motion the court may, and on request of a party the court shall, order that the witnesses be excluded from the courtroom or from a place where they can see or hear the proceedings, and refrain from discussing the facts of the case with anyone other than counsel in the case. In the interests of justice, the court may exempt any witness from its order of exclusion. However, this Article does not authorize exclusion of:
* * * * * *
(2) A single officer or single employee of a party which is not a natural person designated as its representative or case agent by its attorney....
When the prosecutor announced her intention to designate Chief Phares as the State's representative or case agent, the defendant entered an objection on the basis that Phares was a key witness and the lead investigator in the case. The prosecutor responded that the Code of Evidence allowed designation of a case agent and that she needed Phares to help coordinate in excess of fifty witnesses which the State expected to call at the trial. After considering argument from the prosecutor and defense counsel, the trial court overruled the objection.
Generally, the problem of exempting a witness as the State's representative is the potential danger that his testimony might be influenced by listening to the testimony of the other witnesses. See State v. Lopez. In his brief to this Court, the defendant notes that Phares testified on two separate occasions during the trial. Phares was called as the second witness in the case, after the first witness gave testimony relating only to particular addresses located on a map which contained the Goodwood Homesites Subdivision. The defendant concedes that the testimony of this first witness could not possibly have influenced Phares' testimony. However, the defendant contends that, when Phares was recalled to the stand the second time, twenty-two lay witnesses, fifteen police officers, and four experts had testified in the interim. The defendant concludes: "The high probability that Chief Phares' testimony was influenced by the prior 41 witnesses is extremely prejudicial to the appellant."
For the reasons which follow, we disagree with the defendant's assertion of this "high probability" of prejudice. In overruling the defendant's objection, the trial court noted that Phares was not a fact witness to the shooting. However, the trial court found that Phares was a fact witness regarding the taking of statements from Michael Carter and the defendant. The trial court ruled that Phares could not be present in the courtroom whenever any other witness would give testimony in those two areas. Noting that Baton Rouge City Police Officers Steve Woodring and Ben Odom might testify in those two areas, the trial court ruled that Phares should not be present in the courtroom during their testimony. As the State correctly notes in its brief to this Court, Officer Woodring did not testify at the trial; and there is no indication in the record that *1374 Phares was present in the courtroom during the testimony of Officer Odom. Nevertheless, even if Phares remained in the courtroom during Odom's testimony, the State also correctly notes that Officer Odom did not give any testimony about the taking of statements from Carter or the defendant.
Moreover, Phares testified in a pretrial hearing and during the first trial. We have reviewed his testimony from this pretrial hearing and from the first trial and find that it was substantially similar to his testimony at the instant trial, which negates any practical possibility that his testimony at the instant trial could have been influenced by the previous testimony of any other State witness. See State v. Beach, 610 So.2d 908, 915 (La.App. 1st Cir.1992), writ denied, 614 So.2d 1252 (La.1993); State v. Johnson, 604 So.2d 685, 691 (La.App. 1st Cir.1992), writ denied, 610 So.2d 795 (La.1993). Accordingly, given the precautionary steps taken by the trial court to assure that Phares' designation as the State's case agent would not prejudice the defendant, we find no error in the trial court's ruling; and we conclude that the defendant was not prejudiced in any manner when considering all of the circumstances noted above.
This assignment of error is meritless.
ASSIGNMENT OF ERROR NO. THIRTY-EIGHT:
In this assignment of error, the defendant contends that the trial court erred in denying his requested special jury charge.
During the jury charge conference, the defense requested that the trial court exclude any reference to the law of principals and submitted a requested special charge instructing the jury to find the defendant guilty only if he was "the actual perpetrator of the offense." The trial court took the matter under advisement and subsequently denied the requested special jury charge.[4]
La.C.Cr.P. art. 807 provides, in pertinent part:
A requested special charge shall be given by the court if it does not require qualification, limitation, or explanation, and if it is wholly correct and pertinent. It need not be given if it is included in the general charge or in another special charge to be given.
In his brief to this Court, the defendant points to his immunity agreement with the State as the underlying reason for this special jury charge. The immunity agreement provided that the defendant would not be prosecuted if he: (1) truthfully revealed to the police and the grand jury what happened regarding the murder; and (2) if he was not the triggerman. According to the defendant's reasoning, since the State never held a formal pretrial hearing to establish that he had violated these conditions, the State should not have been allowed to use the defendant's grand jury testimony and statements to the police to prove that he violated the immunity agreement by giving false information about the murder. Therefore, the only remaining way the State could prove a violation of the immunity agreement was to prove that the defendant was the triggerman. The product of this line of reasoning is that any jury instruction on the law of principals might result in the defendant's conviction without the State proving that he was the actual triggerman and, therefore, any jury instruction on the law of principals violated the immunity agreement and should have been disallowed by the trial court.
For the reasons which follow, we find no error in the trial court's ruling denying the defendant's requested special jury charge. As will be noted in our treatment of assignment of error number 39, the State actually proved beyond a reasonable doubt that the defendant was in fact the triggerman and, therefore, the immunity agreement was void from the beginning. Furthermore, even if the State did not prove that the defendant was the triggerman, the State did establish that he violated the first condition of the immunity agreement. As previously noted herein, the defendant gave false grand jury testimony in which he identified Michael Carter as the triggerman. The defendant also *1375 gave other conflicting, false statements about this offense to the police. Therefore, by his own actions, the defendant was responsible for the nullity of any immunity agreement. Accordingly, the State did not violate an immunity agreement by trying the defendant under a dual theory (i.e., he was guilty either as the triggerman or as a principal to the offense) since there was not an immunity agreement in existence due to the defendant's violation of both conditions.
This assignment of error is meritless.
ASSIGNMENT OF ERROR NO. THIRTY-NINE:
In this assignment of error, the defendant contends that the evidence was insufficient to support the instant conviction. We note that, in order to challenge this conviction on the basis of insufficiency of the evidence, the defendant should have proceeded by way of a motion for post verdict judgment of acquittal. See La.C.Cr.P. art. 821. Nevertheless, we will consider a claim of insufficiency of the evidence which has been briefed pursuant to a formal assignment of error. See State v. Tate, 506 So.2d 546, 551 (La.App. 1st Cir.), writ denied, 511 So.2d 1152 (La. 1987).
The standard of review for the sufficiency of the evidence to uphold a conviction is whether or not, viewing the evidence in the light most favorable to the prosecution, a rational trier of fact could conclude that the State proved the essential elements of the crime and the defendant's identity as the perpetrator of that crime beyond a reasonable doubt. See La.C.Cr.P. art. 821; State v. Johnson, 461 So.2d 673, 674 (La.App. 1st Cir.1984). The Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979), standard of review incorporated in Article 821 is an objective standard for testing the overall evidence, both direct and circumstantial, for reasonable doubt. When analyzing circumstantial evidence, LSA-R.S. 15:438 provides that the fact finder must be satisfied the overall evidence excludes every reasonable hypothesis of innocence. State v. McLean, 525 So.2d 1251, 1255 (La.App. 1st Cir.), writ denied, 532 So.2d 130 (La.1988). Where the key issue is the defendant's identity as the perpetrator, rather than whether or not the crime was committed, the State is required to negate any reasonable probability of misidentification. State v. Richardson, 459 So.2d 31, 38 (La.App. 1st Cir.1984).
In his brief to this Court, the defendant does not contest the fact that the victim was fatally shot. Instead, he raises the possibility of mistaken identity. The defendant admits that his social security card was found at the scene of the shooting. However, he suggests that his first version of the incident is a possible explanation. The defendant claimed that he was jogging through the neighborhood when he heard gunshots. When he turned the corner and observed what had happened, he began chasing the perpetrators, until he was stopped by Baton Rouge City Police Officer James Wingate.
The defendant notes that, although there were many eyewitnesses to this shooting, not one eyewitness could positively identify him as the triggerman. In fact, the defendant notes that one eyewitness, Henry Jones, initially identified Michael Carter as the triggerman. The defendant also notes another discrepancy regarding the sequence of events during the shooting incident. Mr. Jones apparently indicated that the person who handed the victim some identification was not the gunman. Yet, the only identification found at the scene was defendant's social security card.
Finally, the defendant concedes the fact that Damien Lundy testified in detail concerning the shooting and that Lundy named the defendant as the triggerman. However, the defendant contends that Lundy "initially identified Michael Carter as the triggerman" and he concludes: "The self-serving testimony of Damien Lundy, who has lied previously about the triggerman and could possibly be the triggerman himself, can scarcely be considered reliable or credible."
The defendant's first explanation for his social security card being found at the crime scene is simply outrageous. The defendant was not jogging through the neighborhood when he accidently witnessed a murder. He did not decide to pursue the perpetrators as a civic-minded citizen. The defendant and Lundy were attempting to burglarize a house *1376 when they were stopped by the victim, who apparently asked for identification and took the defendant's social security card shortly before being shot. While none of the eyewitnesses to the shooting could positively identify the defendant as the triggerman, one eyewitness, Kevin Tate, did testify that the defendant "looked like" the gunman who shot and killed the victim.
The defendant's assertion that Lundy first identified Michael Carter as the triggerman is incorrect. Lundy's first statement about the shooting was made in a telephone call to his girlfriend, Patricia Clipps, wherein he informed her that the defendant had shot a motorcycle policeman. After his arrest, Lundy initially told the police that he and defendant were at the crime scene and that the defendant shot the victim. However, at this point of the investigation, the police had focused on Carter as the primary suspect; and this fact was communicated to Lundy. Lundy then changed his story by adding Carter as a third participant and naming Carter as the triggerman. Lundy later explained that he tried to tell the truth initially; but, when the police would not believe him and suggested that Carter was present, he changed his story and told the officers what he believed they wanted to hear.
The defendant's primary argument is that Lundy is not a credible witness. However, as the trier of fact, the jury was free to accept or reject, in whole or in part, the testimony of any witness. State v. Richardson, 459 So.2d at 38. The unanimous guilty verdict returned in this case clearly indicates that the jury accepted the testimony of Damien Lundy and the other key state witnesses. While some conflicting testimony among the eyewitnesses to the shooting was presented herein, where there is conflicting testimony about factual matters, the resolution of which depends upon a determination of the credibility of the witnesses, the matter is one of the weight of the evidence, not its sufficiency. State v. Richardson, 459 So.2d at 38. On appeal, this Court will not assess the credibility of witnesses or reweigh evidence to overturn a fact finder's determination of guilt. State v. Creel, 540 So.2d 511, 514 (La.App. 1st Cir.), writ denied, 546 So.2d 169 (La. 1989).
In our view, one of the most important items of evidence presented herein was the admission made by the defendant to Linda Smith. Shortly after Carter was indicted, the defendant was released from jail. At some point after his release from jail, the defendant encountered Ms. Smith at the bus station on Florida Boulevard. The two had previously worked together at Popeye's and had been students at a vo-tech school. When Ms. Smith heard the defendant discussing the murder, she asked the defendant if he had really murdered the victim; and he responded affirmatively. The defendant stated: "The white motherfucker was at the wrong place at the wrong time." Ms. Smith testified that the defendant had a smile on his face and "was bragging like he killed a prize deer or something." Yet, in his brief, the defendant does not even mention Ms. Smith's testimony.
We have carefully reviewed the record and find that the evidence supports the jury's determination. The direct and circumstantial evidence identifying the defendant as the perpetrator of this offense was sufficient to negate any reasonable probability of misidentification. We are convinced that a rational trier of fact, viewing all of the evidence as favorable to the prosecution as any rational fact finder can, could have concluded that the State proved beyond a reasonable doubt, and to the exclusion of every reasonable hypothesis of innocence, that the defendant was guilty of second degree murder.
This assignment of error is meritless.
CONVICTION AND SENTENCE AFFIRMED.
NOTES
[1] The sentencing transcript does not indicate that the defendant was given credit for time served; however, the minutes do state that he was given credit for time served. See La.C.Cr.P. art. 880. Therefore, rather than remanding for resentencing, we simply order that the defendant be given credit for time served and the district court shall, if necessary, amend the commitment accordingly. See La.C.Cr.P. art. 882.
[2] In determining whether or not the ruling on the defendant's motion to suppress was correct, an appellate court is not limited to the evidence adduced at the hearing on that motion. Instead, this Court also may consider all pertinent evidence given at the trial of the case. State v. Merchant, 490 So.2d 336, 339 n. 2 (La.App. 1st Cir.), writ denied, 496 So.2d 326 (La. 1986).
[3] See La.Code of Evidence art. 1103.
[4] Although the minutes indicate that the trial court denied this requested special jury charge, neither the reasons for the trial court's ruling nor its charge to the jury are contained in the instant record.