699 So.2d 882 (1997)
STATE of Louisiana
v.
Sarah Havely EDMONDSON.
No. 97 KW 0108.
Court of Appeal of Louisiana, First Circuit.
July 28, 1997.
Rehearing Denied September 2, 1997.
*883 Scott M. Perrilloux, District Attorney, Amite, for Plaintiff-Respondent.
James E. Boren and J. Rodney Baum, Baton Rouge, for Defendant-Relator.
Before GONZALES and KUHN, JJ., and CHIASSON,[1] J. Pro Tem..
CHIASSON, Judge Pro-Tem.
Relator, Sarah Havely Edmondson, originally was charged by grand jury indictment with attempted first degree murder, a violation of LSA-R.S. 14:27 and 14:30. Subsequently, the indictment was amended to attempted second degree murder, a violation of LSA-R.S. 14:27 and 30.1; armed robbery, a violation of LSA-R.S. 14:64; and use of a firearm during the commission of a crime of violence, a violation of LSA-R.S. 14:95 E. *884 Relator pled not guilty and filed numerous pretrial motions, including a request for discovery, a motion for a change of venue, and requests for costs of issuing subpoenas duces tecum and for obtaining expert witnesses.
On November 29, 1995, the trial court denied relator's motion to assess costs for issuance of subpoenas duces tecum requested in conjunction with the motion for a change of venue. On January 24, 1996, a hearing was conducted on the State's intent to introduce a statement made by relator to Sammy Webb, an investigator for the District Attorney's Office of the 17th Judicial District of the State of Mississippi, relator's motion to traverse discovery, and the motion to have relator declared indigent in order to request costs and expert witness fees. Part of the hearing was conducted out of the prosecutor's presence, in order for defense counsel to attempt to establish the need for payment of costs and expert witness fees, particularly a certain type of medical expert witness. At the conclusion of this hearing, the trial court requested memoranda and took these matters under advisement. On February 21, 1996, the court issued a lengthy order addressing every discovery request, finding relator's statement to Investigator Webb admissible at trial, and denying relator's requests for costs and expert witness fees.
On February 28, 1996, relator filed a motion to suppress her July 17, 1995 statement to Investigator Webb. On March 5, 1996, relator filed a second motion to suppress her statement. On April 3, 1996, a hearing was conducted on relator's motions to suppress. At the conclusion of this hearing, the trial court requested memoranda and took this matter under advisement. On May 1, 1996, the court issued an order denying relator's motions to suppress her statement.
On July 26, 1996, relator filed a writ application with this court seeking review of these rulings. On September 20, 1996, this court refused to consider the writ application because of rule violations. State v. Edmondson, No. 96 KW 1560 (La.App. 1st Cir. 9/20/96). On October 18, 1996, this court denied a request for rehearing of that writ application. No. 96 KW 1560 (La.App.1st Cir. 10/18/96). Meanwhile, on October 15, 1996, relator filed a second writ application. On November 13, 1996, this court denied the second writ application, referring to the denial of the request for rehearing on October 18, 1996. State v. Edmondson, No. 96 KW 2206 (La.App. 1st Cir. 11/13/96). Relator then applied for supervisory writs with the Louisiana Supreme Court. On January 10, 1997, the Louisiana Supreme Court granted the writ application and remanded the case to this court for consideration of the merits of the application. State v. Edmondson, 96-2783 (La. 1/10/97); 685 So.2d 133.
Three main issues are presented in this application: (1) the denial of the motions to suppress and the admissibility of relator's statement as other crimes evidence; (2) the question of relator's indigent status; and (3) the satisfaction of relator's discovery requests. For the reasons which follow, the writ is granted in part and denied in part.
It is alleged that relator and her companion, Benjamin Darras,[2] left their homes in Oklahoma in early March, 1995, and embarked upon a trip to Memphis, Tennessee, and to New Orleans, Louisiana. On March 7, 1995, Darras allegedly shot and killed William Savage during an armed robbery near Interstate 55 in Hernando, DeSoto County, Mississippi. On March 8, 1995, relator allegedly shot Patsy Beyers[3] during an armed robbery at a convenience store in Ponchatoula, Louisiana.
Relator was arrested and taken into custody by Louisiana police officials at the Muskogee County jail in Muskogee, Oklahoma, on June 22, 1995, and was returned to Louisiana later that day. In early July, relator's Mississippi attorney, Mr. Steven Farese, contacted law enforcement officials concerning information about the murder of Mr. Savage. At that point in time, law enforcement officials were without a suspect for the murder. On *885 July 14, 1995, Mr. Farese negotiated a deal for transactional immunity for relator in Mississippi in connection with the murder of Mr. Savage, refusing to reveal relator's name until the agreement was finalized. In exchange for such immunity, relator agreed to cooperate fully with the State of Mississippi in the investigation and prosecution of that murder case. On July 17 and 18, 1995, Investigator Webb went to the Tangipahoa Parish Jail to speak with relator. Thereafter, Investigator Webb summarized relator's statements into a 4¼ page statement allegedly detailing relator's involvement in the murder of Mr. Savage and the robbery and shooting of Ms. Beyers. The statement is not signed by relator.

ADMISSIBILITY/SUPPRESSION OF STATEMENT
Relator contends that the trial court erred in denying her motions to suppress her statement to Investigator Webb.
Relator argues that, by its very nature, the Mississippi immunity agreement precludes any use of her statement in the instant prosecution. She further contends that her statement was compelled under the terms of the immunity agreement and, therefore, it was involuntary and inadmissible. Finally, relator contends that her statement was inadmissible at trial and should be suppressed because it was given without an advice of Miranda rights.
An examination of the Mississippi immunity agreement reveals that it is titled: "AGREEMENT TO GRANT TRANSACTIONAL IMMUNITY" and further provides the following pertinent language:
[T]he District Attorney for the Seventeenth Judicial District, Robert L. Williams, and Attorney for the Witness have entered into a binding agreement to grant Transactional Immunity to SARAH HAVELY [EDMONDSON] for his/her cooperation and testimony involving the murder and robbery of Bill Savage, which occurred on March 7, 1995 in Desoto County, Mississippi.
This agreement prohibits any prosecution related to the transaction, irrespective of whether there is an independent source for the evidence.... It is understood that the testimony given under this agreement will be non-voluntary and compelled. The witness, SARAH HAVELY [EDMONDSON] will continue to assert his/her Fifth Amendment Rights and State Constitutional Rights against compulsory self-incrimination.
...
13. It is expressly understood and agreed that if the said SARAH HAVELY [EDMONDSON] does not cooperate fully with the District Attorney, Robert L. Williams; then said District Attorney in his sole discretion has the absolute authority to cancel this agreement and declare it void and take any action against said SARAH HAVELY [EDMONDSON] that the District Attorney in his sole discretion chooses to take.
...
The privilege against self incrimination is included in the Fifth Amendment to the United States Constitution and also in Article 1, Section 16 of the Louisiana Constitution of 1974. However, an individual can be compelled to testify under a grant of immunity which is coextensive with the scope of the privilege against self-incrimination. Murphy v. Waterfront Commission of New York Harbor, 378 U.S. 52, 54, 84 S.Ct. 1594, 1596, 12 L.Ed.2d 678 (1964).
A grant of immunity to procure testimony which would otherwise be incriminating is characterized as either "transactional immunity" or "use plus derivative use immunity." Transactional immunity generally means that the individual compelled to testify will not be prosecuted for the crimes about which he or she testifies. Use plus derivative use (or fruits) immunity refers to immunity which will not allow a person's compelled testimony or any evidence derived from that testimony (e.g. leads or witnesses) to be used against him or her in any criminal prosecution. State v. Parker, 625 So.2d 1364, 1368 (La.App. 1st Cir.1993), writ denied, 93-2832 (La. 2/25/94), 632 So.2d 761. However, if the government has independent evidence to convict the person of the crime about *886 which he or she testified under a grant of use immunity, he or she may still be prosecuted.
In Kastigar v. United States, 406 U.S. 441, 453, 92 S.Ct. 1653, 1661, 32 L.Ed.2d 212 (1972), the court explained that a grant of use plus derivative use immunity was sufficient to compel testimony over a claim of the privilege because it was coextensive with the scope of the privilege. The Court concluded that transactional immunity affords broader protection than the Fifth Amendment privilege, and is not constitutionally required. Id. at 453, 92 S.Ct. at 1661. Thus, "[i]n a constitutional sense, ... use immunity is included within transactional immunity, but it can also be constitutionally sufficient alone; the Fifth Amendment requires that a witness compelled to testify be in no worse position in regard to criminal prosecution after he or she testifies than before." United States v. Quatermain, 467 F.Supp. 782, 787-788 (E.D.Pa.1979).
The issue presented herein is whether the immunity granted by Mississippi law enforcement officials prohibits the use of the statement in an unrelated criminal proceeding instituted in Louisiana.
This issue was addressed in Murphy where the Court was called upon to decide whether one jurisdiction within our federal structure may compel a witness, whom it has immunized from prosecution under its laws, to give testimony which might then be used to convict him of a crime in another such jurisdiction. In Murphy, the petitioners were subpoenaed to testify and granted immunity under the laws of New Jersey and New York. Notwithstanding the grant of immunity, they still refused to respond to questions on the ground that the answers might tend to incriminate them under federal laws, to which the grant of immunity did not purport to extend. After being held in civil and criminal contempt of court, the petitioners appealed. Murphy, 378 U.S. at 53-54, 84 S.Ct. at 1596. The United States Supreme Court in a lengthy opinion concluded:
[W]e hold the constitutional rule to be that a state witness may not be compelled to give testimony which may be incriminating under federal law unless the compelled testimony and its fruits cannot be used in any manner by federal officials in connection with a criminal prosecution against him. We conclude, moreover, that in order to implement this constitutional rule and accommodate the interests of the State and Federal Governments in investigating and prosecuting crime, the Federal Government must be prohibited from making any such use of compelled testimony and its fruits. This exclusionary rule, while permitting the States to secure information necessary for effective law enforcement, leaves the witness and the Federal Government in substantially the same position as if the witness had claimed his privilege in the absence of a state grant of immunity. [Footnote omitted.]
Murphy, 378 U.S. at 79, 84 S.Ct. at 1609-1610.
The holding in Murphy was cited with approval in State v. Wallace, 321 So.2d 349, 357 (La.1975) (on rehearing), wherein the Louisiana Supreme Court stated:
But the prosecution may compel a witness to testify against himself only if it guarantees that his testimony will not be used against him in any judicial proceedings, except for perjury in giving such testimony; an immunity statute is constitutional only if its scope is coextensive with the privilege against self-incrimination. Kastigar v. United States, 406 U.S. 441, 92 S.Ct. 1653, 32 L.Ed.2d 212 (1972). Hence, neither the compelled testimony of a witness that was obtained in one forum, nor the fruits of such testimony, can be used against him in another forum. Murphy v. Waterfront Commission of New York, 378 U.S. 52, 84 S.Ct. 1594, 12 L.Ed.2d 678, ... 378 U.S. 52, 84 S.Ct. 1594, 12 L.Ed.2d 678 (1964).
We note that relator is the party who first approached the Mississippi authorities seeking immunity. Therefore, it is arguable that immunity does not apply because the relator's testimony was voluntarily given, rather than compelled. Although the relator, through her attorney, initiated the immunity agreement in exchange for her testimony, she was still giving up her constitutional *887 right not to testify and should not be presumed to have done so for less than her constitutional entitlement. United States v. Quatermain, 467 F.Supp. at 788. See, United States v. Carpenter, 611 F.Supp. 768, 777 (D.C.Ga.1985).
Relator next argues that her statement is inadmissible because she was not advised of her Miranda rights before the statement was given. When relator gave her statement to Investigator Webb on July 17, 1995, it was undisputed that he did not advise her of her Miranda rights. Under the terms of the Mississippi immunity agreement, Investigator Webb did not have to do so. Relator was required to "cooperate fully" in the Mississippi murder investigation and prosecution and to incriminate herself by relating her participation in that murder. According to the terms of the agreement, the District Attorney possessed the "sole discretion" and "absolute authority to cancel this agreement" if relator failed to cooperate. Therefore, when Investigator Webb questioned relator about the events which occurred after the Savage murder, relator was required to confess to the instant offenses; otherwise, the Mississippi authorities might conclude that she failed to "cooperate fully." Under these circumstances the statement cannot be viewed as voluntary. Compare State v. Nall, 379 So.2d 731, 733, (La.1980).
Furthermore, we find no merit in the argument that the relator is not entitled to immunity in this case because she allegedly committed no crimes in Mississippi. Investigator Webb testified during the hearing on the motion to suppress that, according to the facts related by the relator during his interview, she did commit crimes in connection with the murder of Mr. Savage for which she could have been prosecuted under Mississippi law.
Therefore, under the circumstances present herein, the Mississippi immunity agreement is binding upon the State of Louisiana, and prohibits Louisiana from making any use of the compelled testimony and its fruits. This leaves Louisiana and relator in the same position as if she had claimed her privilege in the absence of a state grant of immunity.
Accordingly, we find that the trial court erred in denying relator's motion to suppress the July 17, 1995 statement to Investigator Webb. The trial court's rulings on relator's motions to suppress is hereby reversed. The trial court shall enter an order granting relator's motions to suppress. The State may not use relator's July 17, 1995 statement to Investigator Webb as other crimes evidence under LSA-C.Ev. art. 404 B(1), nor may the State use any of the compelled testimony or its fruits as substantive evidence of her guilt.

INDIGENT STATUS
The parties have stipulated that relator is indigent. However, relator's family has, by various means, raised a considerable sum of money for her defense in Mississippi and in Louisiana.
There are only two specific rulings relating to indigency currently pending before this court: (1) the denial of relator's motion to assess costs for issuance of subpoenas duces tecum requested in conjunction with the motion for a change of venue; and (2) the denial of her request for expert witness fees for a certain type of medical expert. For the following reasons, we find no error in the court's rulings in these matters.
There is no need to issue the subpoenas duces tecum directed to several television stations and newspapers requested by relator herein. Relator's motion for a change of venue already contains excerpts from numerous newspaper articles documenting the publicity surrounding this case. There is no doubt that this case has received considerable media attention. However, at the January 24, 1996 hearing in this matter, the parties agreed to postpone the change of venue issue until the time of trial. A decision on the motion for a change of venue will best be determined immediately before the trial date, either in a "mock" voir dire or the actual voir dire. See State v. Clark, 442 So.2d 1129, 1133-1134 (La.1983); State v. Morris, 429 So.2d 111, 116-118 (La.1983); State v. Goodson, 412 So.2d 1077, 1081 (La. 1982); State v. Rodrigue, 409 So.2d 556, 560 (La.1982); State v. Baldwin, 388 So.2d 679, 682 n. 2 (La.1980); State v. Bell, 315 So.2d *888 307, 311-312 (La.1975). Of course, at that time, the decision on whether or not to grant the change of venue will be a matter left to the sound discretion of the trial court. State v. McKnight, 96-0176 (La. 4/19/96); 671 So.2d 933; State v. Wilson, 467 So.2d 503, 512 (La.), cert. denied, 474 U.S. 911, 106 S.Ct. 281, 88 L.Ed.2d 246 (1985).
The relator also contends that the trial court erred in denying her request for expert witness fees for a certain type of medical expert. In State v. Touchet, 93-2839 p. 3 (La. 9/6/94); 642 So.2d 1213, 1215, the court explained that the State's obligation in providing effective assistance of counsel to an indigent defendant includes furnishing the defense counsel with all of the "basic tools of an adequate defense" at no cost to the indigent defendant. In determining the appropriateness of a particular request for the services of an expert at the expense of the State, the court concluded as follows:
[The indigent defendant] must establish that there exists a reasonable probability both that an expert would be of assistance to the defense and that the denial of expert assistance would result in a fundamentally unfair trial. To meet this standard, a defendant must ordinarily establish, with a reasonable degree of specificity, that the assistance is required to answer a substantial issue or question that is raised by the prosecution's case or to support a critical element of the defense.
Touchet, 93-2839 p. 6, 642 So.2d at 1216.
After reviewing the testimony, documentary evidence (including Defendant's Exhibit 1 under seal), and the arguments presented herein, we find no abuse of discretion in the trial court's ruling that such further testing and/or examination by another medical expert is unnecessary in this case. We cannot further elaborate on this issue, as the primary reason for defense counsel's request was introduced at the January 24, 1996 hearing as Defendant 1 under seal for in camera inspection by the court.
As noted above, it has been stipulated that relator is indigent. Should relator make any further specific requests for costs, examinations, expert witness fees, or the like, the trial court should weigh the need for such requests on an individual basis with due regard to relator's fundamental right to a fair trial and the basic tools of an adequate defense.

DISCOVERY REQUESTS
Relator filed a motion for discovery. When she was not satisfied with the State's discovery responses relator filed a motion to traverse the State's answer to discovery. The court addressed the discovery issues at the January 24, 1996 hearing. On February 21, 1996, the court issued an order addressing, by paragraph, each discovery request, and the court granted or denied same.
Relator complains that the court erred in failing to grant 13 separate discovery requests which allegedly would bear upon testing the reliability and credibility of State witnesses, as follows:
1. Rap Sheets of potential prosecution witnesses.
2. The existence of any exculpatory statements or comments by state witnesses.
3. Information about whether any witnesses have ever stolen anything, made false reports, or lied to law enforcement authorities.
4. Whether there are any plea bargains in existence regarding any witnesses or potential witnesses in this case and the nature of those plea bargains.
5. Whether any witness or potential witness as (sic) refused to submit to a polygraph test or if submitted to, the results of the test.
6. Whether any witness has ever used illegal drugs or is currently or was ever dependent on illegal drugs.
7. Whether any witness or potential witness has any psychologic or mental disorder.
8. Whether any witness or potential witness as (sic) any prior business or personal or criminal dealings with Sarah Edmondson.
9. Whether any witness has any type of financial arrangement with any federal, state or local authority.

*889 10. Whether any witness or potential witness is currently or has ever cooperated with any federal, state or local law enforcement agency.
11. Whether any witness is or has ever been a paid informant.
12. Whether there is any individual the state has interviewed who it will not call as a witness.
13. Whether there are any inconsistencies in statements made by any potential witness or witnesses.
The court granted paragraph 11 of relator's discovery motion, which deals with exculpatory evidence. Of course, the State has a continuing duty to disclose such evidence. Contrary to relator's assertions herein, the only error in the court's February 21, 1996 discovery order involves the production of rap sheets. The court generally denied this request, except for ordering the State to furnish relator "with any `rap sheets' on Benjamin Darras if and when obtained." Recently, in State v. Thomas, 96-0916, pp. 6-7 (La.App. 1st Cir. 5/9/97); 693 So.2d 1308, 1311 this court concluded:
In this case, the defendant's request for information from the prosecutor, insofar as it called for the current rap sheets of the state's witnesses, constituted a specific and relevant request. Therefore, we conclude that the trial judge erred in not requiring the prosecutor to respond to the specific request of the defendant by stating whether the state had knowledge or possession of current rap sheets, or whether the current rap sheets were available to the state, and, if so, by not requiring the prosecutor to furnish them to the defendant or submit them to the court for a determination as to whether the defendant was entitled to this material. [Footnote omitted.]
Therefore, regarding rap sheets of State witnesses, the State shall proceed in accordance with this recent ruling in Thomas. Otherwise, we find no error in the court's discovery order.
WRIT GRANTED IN PART AND DENIED IN PART.
GONZALES, J., argues and may assign additional reasons.
KUHN, J., dissents in part and concurs in part with reasons.
KUHN, Judge, dissenting in part and concurring in part.
Upon close scrutiny, it is evident that the breadth of the principles derived from the United States Supreme Court cases is not as broad sweeping as the majority has construed. Murphy v. Waterfront Commission of New York Harbor, 378 U.S. 52, 84 S.Ct. 1594, 12 L.Ed.2d 678 (1964), involved the issue of whether a grant of immunity by a state is binding upon the federal government. The United States Supreme Court concluded that it is. To hold otherwise would make a grant of immunity from state prosecution of little or no value in situations where a defendant may be charged with both state and federal crimes as a result of one set of circumstances and actions by that individual. A similar situation existed in Kastigar v. United States, 406 U.S. 441, 92 S.Ct. 1653, 32 L.Ed.2d 212 (1972), wherein the threshold issue (whether the particular act of Congress creating the federal witness immunity statute was constitutional) was first addressed, followed by a conclusion that use plus derivative use immunity is coextensive with the scope of the privilege against self-incrimination. However, it is imperative to note that neither Murphy nor Kastigar dealt with the relationships among sovereign states. In my view, these cases could not even remotely be considered to be controlling in a situation such as this one, where a grant of immunity in one state is alleged to have had an adverse impact upon the right of another state to prosecute separate criminal acts. Yet, that is precisely what we are now required to consider.
The relationship of the national government and a state is a federal one, i.e., governmental sovereignty is distributed between a central sovereign and a sovereign state. It was this "federal" relationship that was the focal point upon which the holdings of Murphy and Kastigar revolved. In both those cases, the Court addressed questions of overlapping federal and state criminal jurisdiction. *890 In the matter presently before us, there is no "federal" relationship implicated; the relationship at issue is one between two sovereign states vis-á-vis one another, i.e, the two sovereign states of Louisiana and Mississippi. In the absence of any kind of formal agreement between Louisiana and Mississippi, (and there is no indication of such a formal agreement under the facts of this case) overlapping criminal jurisdiction does not exist. Thus, the reasoning extracted from Murphy and Kastigar can be of no moment in resolving the issues raised in this controversy.
It is axiomatic that each state is a sovereign unto itself. To permit a grant of immunity by the State of Mississippi (intended to obtain information relative to the investigation and prosecution of a crime committed in Mississippi) to be binding upon the State of Louisiana for criminal acts committed in Louisiana is contrary to the mandate of the Fifth Amendment to the United States Constitution which, after all, is the primary constitutional provision called into focus in this case. The Fifth Amendment provides:
No person shall be held to answer for a capital, or otherwise infamous crime, unless on a presentment or indictment of a Grand Jury, except in cases arising in the land or naval forces, or in the Militia, when in actual service in time of War or public danger; nor shall any person be subject for the same offence to be twice put in jeopardy of life or limb; nor shall be compelled in any criminal case to be a witness against himself, nor be deprived of life, liberty, or property, without due process of law; nor shall private property be taken for public use, without just compensation. (Emphasis added.)
Nothing in the Fifth Amendment supports the proposition posited by the majority, i.e., that one sovereign state can bind another sovereign state through immunity agreements. If the majority is correct, under the facts of this case, Oklahoma could grant immunity to relator, and ALLOW her to testify about everything relative to her actions during her alleged multi-state crime spree. Attempts to prosecute relator in Louisiana (and any other states in which she may have committed crimes) will have been effectively frustrated. James Madison, in proposing the Fifth Amendment, certainly did not contemplate the result reached by the majority in this case. I believe that neither the United States nor the Louisiana Supreme Courts, in interpreting the Fifth Amendment, could have intended such a result.
In this case, the immunity agreement arose as a result of a Mississippi attorney approaching a Mississippi District Attorney with the offer of relator's cooperation in the investigation and prosecution of the individual responsible for committing a robbery and murder in Mississippi. In exchange for such cooperation and testimony, Mississippi granted relator immunity from prosecution in Mississippi.
The jurisprudence relied upon by the majority simply does not address the issue of whether a grant of immunity by one state is binding upon another separate, sovereign state.
One sovereign state cannot bind another. In drafting the United States Constitution, the delegates GRANTED sovereignty to the FEDERAL government on specific delineated matters. Each state reserved unto itself the sovereignty not conferred to the federal government by the United States Constitution. See Amendment X of the United States Constitution. While the states may well have surrendered specific aspects of their individual sovereignty in order to form a stronger national government, that fact did not confer those aspects of their sovereignty to other states.
The majority's discussion of the failure of law enforcement officials to re-advise relator of her Miranda rights immediately prior to her statement also misses the mark. The record clearly establishes that relator was advised of her rights many times after her arrest. Additionally, she spoke with her attorney by telephone about giving her statement just before her disclosure. Her attorney advised law enforcement officials to proceed with the taking of her statement.
Absent some significant break in the interrogation process, such as a specific request for assistance of counsel, repetition of Miranda *891 warnings prior to taking a defendant's statement is not required. A requirement that the Miranda warnings be repeated before each separate interrogation period would quickly degenerate into a formalistic ritual. State v. Harvill, 403 So.2d 706, 709 (La.1981). Despite the length of time which elapsed since her last Miranda warning, under these particular circumstances, the lack of a Miranda warning by Investigator Webb does not mandate suppression of relator's statement. Relator was represented by counsel in Oklahoma, Mississippi, and Louisiana. Between the time of her arrest and the statement to Investigator Webb, relator obviously exercised her right to counsel and her right to remain silent as she made no statements whatsoever until the July 17, 1995 statement to Investigator Webb. Relator consulted (by telephone) with her Louisiana attorney, Jim Boren, immediately prior to her statement. Although it had been over three weeks since relator was last advised of her Miranda rights, she understood and exercised those rights during the interim between her arrest and her statement to Webb, and in choosing to speak with Webb pursuant to the immunity agreement, relator voluntarily waived her right against self-incrimination.
Additionally, relator's decision to speak with Webb is not rendered involuntary due to a promise or inducement of immunity. In reaching this conclusion, it is important to realize that this situation is not one in which the State of Mississippi compelled a hostile witness to incriminate herself in exchange for a grant of immunity. Instead, relator, through her Mississippi attorney, approached the Mississippi authorities and initiated the immunity deal. So far, relator has received exactly what she bargained for: transactional immunity for the Savage murder. Relator was never compelled to enter into this agreement with the State of Mississippi in the first place. Instead, only after the agreement was negotiated was relator required to honor the agreement by speaking with Investigator Webb.
In State v. Wallace, 321 So.2d 349, 357 (La.1975), the Louisiana Supreme Court stated:
But the prosecution may compel a witness to testify against himself only if it guarantees that his testimony will not be used against him in any judicial proceeding, except for perjury in giving such testimony; an immunity statute is constitutional only if its scope is coextensive with the privilege against self-incrimination. Hence, neither the compelled testimony of a witness that was obtained in one forum, nor the fruits of such testimony, can be used against him in another forum.
The fifth amendment, however, like the instant immunity provision, proscribes only the use of compelled inculpatory testimony, not testimony given voluntarily. The privilege against self-incrimination is a personal right, which may be waived. It is "solely for the benefit of the witness, and is deemed waived unless invoked." (Citations omitted).
Relator's statement to Investigator Webb was not "compelled," i.e., Mississippi did not "force" her to incriminate herself in exchange for a grant of immunity. After examining all of the evidence introduced herein, particularly the immunity agreement itself, it is clear that relator did not negotiate immunity for any other crimes which she may have committed, either in Mississippi or in any other jurisdiction. Although the situation presented in State v. Lewis, 539 So.2d 1199 (La. 1989), involved a plea bargain, a comparison of Lewis with this case is enlightening. Lewis was led to believe that he gave evidence in exchange for the State's promise of immunity and, therefore, his statements were not voluntary. In Lewis, the Supreme Court used contract principles to resolve the situation. Applying contract principles to the facts now before the court, it is clear that relator received exactly what she bargained for, but only what she bargained for, i.e., transactional immunity from prosecution for the Savage murder. Quoting from United States v. Long, 852 F.2d 975, 978 (7th Cir.1988), the Louisiana Supreme Court in Lewis stated: "[H]indsight realization that a deal was not as good as originally hoped for is not sufficient reason to suppress such evidence." State v. Lewis, 539 So.2d at 1203.
*892 In Shotwell Manufacturing Co. v. United States, 371 U.S. 341, 83 S.Ct. 448, 9 L.Ed.2d 357 (1963), the United States Supreme Court stated: "A coerced confession claim, whether founded on a promise of immunity or otherwise, always involves this question: did the governmental conduct complained of `bring about' a confession `not freely self-determined'?" Shotwell Manufacturing Co. v. United States, 371 U.S. at 348, 83 S.Ct. at 453. Thus, the most significant inquiry raised under the facts in the present matter is whether the protections afforded relator/defendant by the Fifth Amendment of the United States Constitution and Art. I, Sec. 13 of the Louisiana Constitution were violated in the taking of the statement.
There is no evidence whatsoever of any action by any law enforcement official from which the conclusion that relator's statement was compelled or coerced can be drawn or inferred. As noted above, there is, however, ample evidence that the statement sought to be suppressed was freely and voluntarily made. Certainly Louisiana's conduct did not bring about an involuntary confession, since Louisiana had no control or influence over the Mississippi immunity agreement or Investigator Webb's questioning of relator. There is no evidence, or even a suggestion, that the State of Mississippi engaged in suspicious or misleading conduct. Mississippi officials were simply trying to solve the murder of Mr. Savage after having been approached by an attorney (Farese) who offered the cooperation of a witness (relator) in exchange for transactional immunity from prosecution for this murder. Because relator, of her own initiative, entered into the Mississippi immunity agreement, she freely and voluntarily gave the statement to Investigator Webb on July 17, 1995, after consulting with her retained counsel.
Accordingly, the statement given by relator regarding her actions in Louisiana was freely and voluntarily made and should not be suppressed, and I dissent from the majority's conclusion to the contrary.
Insofar as the issues raised regarding relator's indigent status, I agree with the majority's treatment of relator's requests for assessment of costs for the issuance of subpoenas duces tecum in conjunction with her motion for change of venue. While I agree with the affirmance of the trial court's denial of relator's request for expert fees, I write separately to avoid any misunderstanding of the language utilized in reaching the conclusion. The majority correctly points out that all defendants are entitled to a fair and impartial trial; however, this statement should not be construed to mean that, through a finding of indigency, the State is obligated to finance the creation of a defense.
Lastly, the majority's resolution of relator's discovery request for production of rap sheets by the State is overly broad. The request for rap sheets should be treated in accordance with all potential Brady material. First, a showing that the information sought is connected with the perpetration of the charged offense should be made by the defendant. If the rap sheet pertain to material witness and the trial court, after an in camera inspection, determines that the information contained in the rap sheet may effect the witness' credibility, only then should the State be required to provide it.
NOTES
[1] Judge Remy Chiasson, retired, is serving as judge pro tempore by special appointment of the Louisiana Supreme Court.
[2] The spellings "Daris" and "Darus" also are found at various places in the record.
[3] This spelling is taken from the indictment and amended indictment, although the spelling "Byers" also appears at numerous places in the record.