700 So.2d 961 (1997)
STATE of Louisiana
v.
Donald Earl LUTCHER.
No. 96 KA 2378.
Court of Appeal of Louisiana, First Circuit.
September 19, 1997.
*964 Douglas H. Greenburg, District Attorney, Juan W. Pickett, Asst. Dist. Atty., Houma, for Plaintiff-Appellee.
Margaret S. Sollars, Thibodaux, for Defendant-Appellant.
Before LOTTINGER, C.J., and SHORTESS and FOGG, JJ.
SHORTESS, Judge.
Donald Earl Lutcher was indicted with second degree murder. La. R.S. 14:30.1(A)(1). He pled not guilty and, after trial by jury, was found guilty as charged. On appeal, this court reversed the conviction and sentence and remanded for a new trial. State v. Lutcher, 94-0291 (La.App. 1st Cir. 3/3/95), 652 So.2d 545, writ denied, 95-0847 (La. 11/13/95), 662 So.2d 464. Upon retrial, defendant was found guilty as charged. The court sentenced him to life imprisonment at hard labor, without benefit of parole, probation or suspension of sentence. Defendant has appealed. He filed no assignments of error, but in his brief he argues six issues. Although these issues were not assigned as error, we are required to consider them. See State v. Galliano, 93-1101, p. 2 n. 1 (La.App. 1st Cir. 5/5/95), 655 So.2d 538, 540 n. 1.

FACTS
Defendant and his wife, Sandra Trosclair Lutcher (the victim), lived together in Houston, Texas, until November 1991, when the victim went to Gibson, Louisiana, to check on her ailing mother. While the victim was in Louisiana, she started seeing another man. In April 1992, defendant came to Gibson. After visiting with the victim he believed they would be getting back together. On the evening of April 19, 1992, defendant went to see the victim. He met her outside a lounge near her trailer. They spoke for about five *965 or ten minutes. A woman who lived nearby overheard defendant twice ask the victim to return to Houston to live with him. She responded that she did not want to be with him. The woman did not consider the conversation to be violent. When defendant and the victim finished talking, she went back into the lounge, and defendant went behind her trailer.
Sometime after going back into the lounge, the victim asked her brother, John Roy Trosclair, III, (John) to go with her to check on her trailer. They walked to the trailer, went inside, and found everything to be in order. After the victim closed the door to leave, defendant ran from behind the trailer with a knife, which John described as long with a straight blade. Trosclair told the victim to run, and he started running to the lounge to get help. As the victim ran, defendant stabbed her in the back. When she fell to the ground, defendant continued to stab her. While defendant was chasing and stabbing the victim, he said things like, "Why you wrote him a letter? Why you're telling ... him that you love him ...?" The victim died from the stab wounds.
Defendant fled from the scene on foot. Shortly after the offense, Deputy Randy Trosclair (Trosclair) of the Terrebonne Parish Sheriff's Office located defendant and arrested him. During a search of defendant's person, the deputy seized a pocketknife. After being advised of his rights, defendant told the deputy he had just left his wife's residence after stabbing her. He said he stabbed his wife because she was seeing another man. When the deputy asked defendant what weapon he used, defendant pointed to the pocketknife. An investigator from the district attorney's office asked defendant why he killed his wife, and defendant replied, "I had to kill her."
Defendant was interviewed in more detail during a taped statement at the sheriff's office. He told law enforcement officers he spoke to the victim by phone while she was at the lounge. In the conversation, she said she was mad at him. He then went to the lounge and had somebody ask her to come outside to talk to him. When she did, they spoke but did not argue.
Defendant claimed that during his conversation with the victim, the victim's brother John and Gregory Johnson, the victim's boyfriend, walked up. When defendant saw the men, he took out his pocketknife because he and Gregory had fought before. Defendant then used the knife to stab the victim.
When the officers asked him why he stabbed the victim, he said he did not know. He denied cutting the victim's throat, and he said he did not remember how many times he stabbed her. He said he thought he stabbed her only two or three times. When an officer asked if he killed her because she was at the bar with her boyfriend at a time when he thought they were getting back together, defendant agreed that might have been his reason. Defendant denied he had seen the victim with her boyfriend at the lounge. Defendant said he had been drinking since early in the morning and was angry and drunk when the murder occurred.
According to the pathologist who performed the autopsy, the victim had twenty-eight wounds to her body and bled to death as a result of those wounds. Two of the wounds were potentially fatal, one which severed the windpipe and cut into an artery and another to the mid-chest which penetrated a major vessel leading from the heart. Because two of the wounds on the victim's back appeared to be exit wounds, the pathologist believed the victim was stabbed all the way through her body (from front to back) for these two wounds. The pathologist considered wounds on the victim's hands, forearms, and arms to be defensive wounds.
To assist in proving intent to kill, the State introduced testimony concerning a prior incident in which defendant threatened to kill the victim. During December 1991, the victim sometimes stayed at the home of Betty R. Ruffin, Gregory Johnson's mother. Defendant came to Louisiana to visit then. At about 3 p.m. on December 10, 1991, defendant came to Ruffin's house and told her he wanted the victim to come outside. Ruffin told him the victim was not coming outside and asked him to leave. Before leaving, defendant said, "But I'll be back." Scared, Ruffin reported the incident to the police.
*966 Later, defendant returned to Ruffin's house, again asking for the victim. When Ruffin told him the victim was not coming outside, defendant said, "The bitch must die." Defendant also told Ruffin he was going to remain at her house. Ruffin again called the police, and when the police arrived defendant started running. The victim later secured an order from the justice of the peace that informed defendant she did not want him on her property.
At the trial, several witnesses testified on behalf of defendant. They described the relationship between defendant and the victim as loving and without problems. Defendant's mother and sisters detailed defendant's consumption of alcohol on the date of the offense. They claimed he was drunk before the offense.
Defendant also testified. He described the various alcoholic drinks he consumed that day. He claimed he did not remember stabbing the victim but had accepted he was the person who stabbed her after reading news reports about the murder. He also testified that he and the victim had been married for seven and one-half years. For the last five years of the marriage they lived in Houston. When defendant came to the Gibson area in April 1992, he learned the victim was having an affair. After spending time with her and discussing their relationship, he felt secure about the marriage. On the afternoon of the offense, he expected the victim to come to a family barbecue but she did not come. He testified that, after talking to the victim outside the lounge, he no longer felt secure about the marriage. According to defendant, the murder was an "accident" because "it never was supposed to happen that way."

DENIAL OF CHALLENGES FOR CAUSE
In the first argument, defendant claims the court erred when it denied the defense challenges for cause of five prospective jurors: Jean Dagenhardt, Melanie Soudelier, Joseph Crawford, Wayne Bourgeois, and Steven Dupre.
Article 797 of the Louisiana Code of Criminal Procedure provides several grounds for which a prospective juror may be challenged for cause, including the following:
(2) The juror is not impartial, whatever the cause of his partiality. An opinion or impression as to the guilt or innocence of the defendant shall not of itself be sufficient ground of challenge to a juror, if he declares, and the court is satisfied, that he can render an impartial verdict according to the law and the evidence;
....
(4) The juror will not accept the law as given to him by the court.
....
To prove there has been error warranting reversal of the conviction and sentence, defendant need only show (1) the erroneous denial of a challenge for cause, and (2) the use of all his peremptory challenges. The trial court is vested with broad discretion in ruling on challenges for cause, and its rulings will be reversed only when a review of the entire voir dire reveals the court abused its discretion. State v. Cross, 93-1189, pp. 6-7 (La. 6/30/95), 658 So.2d 683, 686-87. A trial court's refusal to excuse a prospective juror for cause is not an abuse of discretion, notwithstanding that the juror has voiced an opinion seemingly prejudicial to the defense, if on further inquiry or instruction he has demonstrated a willingness and ability to decide the case impartially according to the law and evidence. State v. Cross, 93-1189 at p. 8, 658 So.2d at 687.
Since defendant exhausted all of his peremptory challenges, we are left only with the task of deciding if the trial court erred in denying defendant's challenges for cause. Defendant argues Dagenhardt, Soudelier, and Crawford should have been excused for cause because they were unable to accept the defense of intoxication or return a verdict of manslaughter. He also claims Dagenhardt and Crawford were unable to afford him the presumption of innocence.
During voir dire, defendant challenged Dagenhardt solely on the ground she was unable to accept the defense of intoxication. Dagenhardt initially told defense counsel she had a "problem" with intoxication negating the element of specific intent. Later, the court extensively explained the defense *967 and the applicable law and told the prospective jurors they would have to follow the law even if they disagreed with the defense. In response to questioning by the court, Dagenhardt said she would be able to follow the law on intoxication. To the extent Dagenhardt initially expressed reluctance to follow the law, her responses to the court's subsequent instructions support the court's decision that she was willing and able to follow the law.
Defendant's remaining claims concerning Dagenhardt, that she was unable to render a verdict of manslaughter and unable to give defendant the presumption of innocence, were not argued before the trial court and thus were not preserved for appeal. Moreover, we find the record does not support the claims. In explaining the presumption of innocence, defense counsel asked if any of the jurors believed defendant was guilty merely because he had been charged. None of the jurors responded affirmatively to this question. Counsel then told the jurors to imagine there was a line stretching from a finding of innocence to a finding of guilt and asked them where on the line they were leaning. Dagenhardt said she was "[l]eaning toward innocent until the State proves him guilty," and she described her position as being somewhere between the middle and a finding of innocence. After the attorney explained the presumption of innocence further and asked if there were any jurors who could not accept that they would have to believe at that time the defendant was 100 percent innocent, some of the jurors, but not Dagenhardt, responded they would be unable to accept that principle.
When counsel explained the possibility of a manslaughter verdict and asked if anyone would have trouble returning that verdict, Dagenhardt initially said she would have a problem with such a verdict if defendant claimed he was under the influence of alcohol or drugs. The attorney reminded Dagenhardt the question was about the possibility of a manslaughter verdict and not about intoxication as a defense. Dagenhardt said she would have no problem with manslaughter as a possible verdict. Later, the court reminded the jurors about its earlier instructions on the presumption of innocence. The court asked if the jurors understood that, in the absence of evidence, their position should be 100 percent innocence. The court noted that all of the jurors shook their heads in understanding.
The court also explained the verdict of manslaughter and told the jurors they would have to follow the law on manslaughter even if they disagreed with the law. The court asked if any of them had a problem with that particular law, and Dagenhardt did not respond. Under these circumstances, the record does not support defendant's claim that Dagenhardt showed an inability to follow the law on the presumption of innocence or the verdict of manslaughter.
Defendant challenged Melanie Soudelier on the ground she was not able to accept that intoxication could negate the element of specific intent. Soudelier was on the same panel with Dagenhardt. After defense counsel discussed the law concerning intoxication as negating the element of specific intent, counsel asked if any of the jurors had a problem with the theory. Counsel noted Soudelier raised her hand but did not question her any further concerning the issue.
Later, the court explained the verdict of manslaughter and told the jurors they must follow the law even if they disagree with the law. When the court asked if any of the jurors had a problem with that law, Soudelier did not respond. The court also extensively explained intoxication as a defense and told the jurors they would have to follow the law on intoxication even if they disagreed with the law. When the court asked if there were any jurors who would be unable to follow the law on intoxication, Soudelier did not respond. Under these circumstances, the court did not abuse its discretion when it denied the challenge for cause of Soudelier based on her inability to accept the law on intoxication. Furthermore, the record does not support the additional argument defendant raises on appeal that Soudelier was unwilling to consider a verdict of manslaughter.
Defendant challenged Joseph Crawford based on Crawford's statements concerning *968 the possibility of manslaughter as a verdict. After defense counsel explained the verdict of manslaughter, Crawford indicated he believed a person who was "temporarily insane" might lose their self-control and cool reflection. Crawford also said he would not be able to return a verdict of manslaughter unless a doctor or psychiatrist testified that defendant was temporarily insane. When counsel described a classic example of manslaughter (man returns home from a business trip and finds his wife in bed with another man), Crawford says he thought that would be "justifiable homicide." Later, the court instructed the jurors on manslaughter as a verdict and told the jurors they would have to follow the law even if they disagreed with the statute. The court specifically asked Crawford if he would be able to follow the law, and Crawford said he would. Under these circumstances, the court did not abuse its discretion when it denied the challenge for cause.
On appeal, defendant also argues Crawford was unable to accept the defense of intoxication and unable to provide defendant with the presumption of innocence. These arguments were not preserved for appeal. Moreover, the record does not support the allegations. Crawford was on the same panel as Dagenhardt. As discussed above, when defense counsel asked if any of the prospective jurors thought defendant was guilty just because he had been charged with a crime, none of the jurors responded. When the attorney asked Crawford where his beliefs fell on the line between innocence and guilt, Crawford said he was in the middle. Crawford raised his hand when the attorney asked if there were any jurors who could not accept that they had to believe at that time the defendant was 100 percent innocent. Defense counsel also questioned the jurors about intoxication as a defense. The attorney noted that Crawford did not raise his hand to show he had any objections to such a defense. Later, the court instructed the jurors further concerning the presumption of innocence. The court reminded them that without any evidence they would have to consider defendant to be innocent. After asking the jurors if they understood, the court indicated that all of the jurors shook their heads to signify they understood the court's instructions.
Defendant argues Wayne Bourgeois and Steven Dupre should have been excused for cause because they were preoccupied with their jobs and thus unwilling to deliberate as jurors. Bourgeois was on the first panel of prospective jurors. Defendant's attorney told the panel she had seen jurors who were so eager to complete their jury service that they did not care how they voted. When she asked if anyone was like that, Bourgeois responded that he was "job oriented" and that his job depended on him. Bourgeois worked at Control Valve Specialists. When questioned further, he said he was "just not crazy about being here," but he would be able to put his job and concerns aside and give 100 percent attention to the jury. When defense counsel challenged Bourgeois on the ground he was preoccupied with his job, she said Bourgeois seemed distracted during questioning by both her and the State. The prosecutor responded that, although he did not notice Bourgeois during questioning by the defense, he paid attention to Bourgeois when he was conducting the State's voir dire. The prosecutor did not consider Bourgeois to be distracted during his questioning.
Dupre was on the second panel of prospective jurors. Dupre had worked for twelve years as the landfill coordinator for the Terrebonne Parish Consolidated Government. When the court told the jurors the expected length of the trial and asked if there were any business reasons why they could not serve as impartial jurors, Dupre did not respond. Later, when the court asked if there were any prospective jurors who did not want to serve on the jury, Dupre said he would rather be at his job. During questioning by the defense, Dupre said he did not care if defendant got a fair trial and he would rather be at work "instead of serving my time in here." At that time, Dupre responded affirmatively when asked if he would vote with whichever side was ahead so he could be finished with his jury service. After the court reminded Dupre that citizens of the United States had a responsibility to *969 serve as jurors, Dupre repeatedly said he would be able to follow the court's instructions if chosen as a juror and would give both sides a fair trial. Dupre also expressed a willingness and the ability to follow the law on intoxication as a defense, manslaughter as a responsive verdict, and the requirement that the state prove the defendant's guilt beyond a reasonable doubt.
Despite the preferences both Bourgeois and Dupre expressed for their jobs over jury service, their responses showed they nonetheless would be able to concentrate on the trial, consider the evidence presented, and render an impartial decision. On this record, the trial court did not abuse its discretion in denying these challenges for cause. See State v. Hattaway, 28,060, p. 4 (La.App. 2d Cir. 5/8/96), 674 So.2d 380, 385-86, writ denied, 96-1900 (La. 1/10/97), 685 So.2d 141.
For these reasons, we find no abuse of discretion in the court's denial of defendant's challenges for cause. Defendant's first argument has no merit.

INTRODUCTION OF PRIOR INCIDENT
In the second argument, defendant maintains the court erred when it admitted testimony of Ruffin, Deputy Randy Trosclair, and Investigator D.L. Mosely concerning a prior incident which occurred on December 10, 1991, and when it allowed the state to cross-examine Rosa Lewis about a restraining order issued after the incident by a justice of the peace. Defendant argues this testimony was inadmissible as hearsay.
Related to the issues raised in this section are arguments advanced in the fourth section concerning the testimony of Mosely on rebuttal. Defendant argues Mosely's testimony on rebuttal was inadmissible other-crimes evidence. Defendant claims the prior criminal act should not have been admitted because he never was convicted of the offense and the incident occurred over four months before the murder.
Prior to trial the State gave notice of its intent to introduce evidence concerning defendant's arrest, on December 10, 1991, for disturbing the peace and entering and remaining after being forbidden. At the hearing, the prosecutor indicated he did not actually want to introduce evidence of the arrest but wanted to show evidence that defendant threatened to kill the victim. After a hearing, the court ruled the evidence was admissible to show defendant's intent.
During Ruffin's testimony defendant objected on the basis of hearsay to Ruffin repeating the threats defendant made when he came to her residence in December. The court overruled the objection. On cross-examination, Ruffin acknowledged that, in her written statement to the police, she did not include the threat defendant made the second time he came to her house ("The bitch must die."). However, she claimed she told the police about the threat.
Trosclair testified that, in December 1991, Mosely, an investigator with the district attorney's office, contacted him concerning the complaints filed by Ruffin. During the investigation, Trosclair determined defendant had threatened the victim. Defendant objected to this testimony on the ground it was irrelevant because of the passage of time. The court overruled the objection. When the prosecutor asked Trosclair for the substance of the threats made by defendant, defendant objected on the ground of hearsay, and the court sustained the objection.
On direct examination, Mosely also was asked about the prior incident. Mosely testified he assisted the sheriff's office in investigating the prior incident. He described defendant's physical condition on that day and said it was noticeable that defendant had been drinking. He also compared defendant's condition in December to his condition on the date of the murder and concluded defendant did not show any signs of intoxication on the date of murder. Defendant objected to the testimony on the ground it introduced "prior acts." The court overruled the objection.
Defendant's mother, Rosa Lewis, testified as a witness for the defense. On direct examination, she said she was not aware of any problems between defendant and the victim, and they appeared to be a loving couple. On cross-examination, the prosecutor asked if she was aware that, in December, defendant was served with a restraining order to stay away from the victim. Lewis *970 said she did not know about the order. When the prosecutor asked if defendant had mentioned the order when he returned to Houston in January, the defense objected on the ground the line of questioning assumed facts which were not in evidence. The court overruled the objection.
Defendant argues the testimony of Ruffin, Trosclair, Mosely, and Lewis was inadmissible hearsay evidence. Initially, we note defendant's hearsay objection during Trosclair's testimony was sustained. We also note defendant did not object to the testimony of Mosely or Lewis on this ground. Defendant's main complaint appears to be to the introduction of Ruffin's testimony concerning the threats defendant made during the prior incident.
Hearsay is a statement, other than one made by the declarant while testifying at the present trial or hearing, offered in evidence to prove the truth of the matter asserted. La.Code Evid. art. 801(C). A witnesses own statement offered against him is a person admission, which is not hearsay. See La.Code Evid. art. 801(D)(2)(a); State v. Dixon, 620 So.2d 904, 909 (La.App. 1st Cir. 1993). Ruffin repeated threats defendant made in her presence. Therefore, the statements were an admission and are not hearsay.
Defendant also argues that Ruffin's testimony should not have been admitted because she lacked credibility. The basis for this argument is that Ruffin did not include in her statement to the police the threat defendant made on his second visit to her house. Ruffin's failure to include the threat in her written statement is a factor the jury could consider in judging her credibility, but this factor does not affect the admissibility of the evidence.
The final instance when the State introduced evidence concerning the prior incident occurred when the State recalled Mosely as a witness on rebuttal. Defendant objected to his rebuttal testimony on the basis that it would not lead to any information which could not already have been presented in the State's case-in-chief. The court overruled the objection. Mosely then testified that he served defendant with a copy of the order issued by a justice of the peace. Mosely also identified a copy of the order. When the State introduced the order, defendant objected on the ground the document was hearsay and was not a public record.
Defendant argues this testimony by Mosely on rebuttal was inadmissible other-crimes evidence because defendant was never convicted of the act and the act was remote in time. Generally, the remoteness in time of prior difficulties between the defendant and the victim affects only the weight of the evidence, not its admissibility. Dixon, 620 So.2d at 909. Article 404(B) of the Code of Evidence authorizes the admission of "other crimes, wrongs, or acts." It is not necessary for the prior incident to have resulted in a criminal conviction. Accordingly, these arguments are meritless.
For these reasons, we find no merit in defendant's arguments concerning the admission of evidence regarding the prior incident.

INTRODUCTION OF POCKETKNIFE
In the third issue raised in defendant's brief, he contends the court erred when it admitted the pocketknife because it had no connection with the case. Defendant claims admission of the knife served only to inflame the jury by showing he regularly carried such a knife.
After the arrest, defendant told the deputy he used his pocketknife to stab the victim. The deputy seized the knife, and it was introduced into evidence at the trial. The knife is a folding knife, and it has a three-inch blade. The victim's brother witnessed the stabbing, and he testified the knife used by defendant in the attack was a "long knife" with a "straight" (not a folding) blade. The pathologist who performed the autopsy testified that, although it was difficult for him to match a knife to a particular wound, the victim's wounds could have been made with the pocketknife. The pathologist also testified that two of the wounds penetrated the victim's body from front to back, and the blade on the knife would have to have been seven inches to make such wounds.
Defendant argues the pocketknife was irrelevant because the evidence discounted *971 his statement that he used the pocketknife to stab the victim. Initially, we note defendant did not preserve this issue for review on appeal. When the knife was introduced, defendant objected "for reasons detailed in our prior motions." The basis for the pretrial motion to suppress was the evidence (including the pocketknife) was seized during a warrantless search without probable cause. Defendant did not include the argument advanced on appeal in any of his motions or in arguments at the hearing held on the pretrial motions. Thus, he is barred procedurally from raising the admissibility of the pocketknife on appeal. See State v. Fontenot, 618 So.2d 915, 920 (La.App. 1st Cir.), writ denied, 623 So.2d 1332 (La.1993). See also La.Code Evid. art. 103(A)(1).
Furthermore, the relevancy of the knife was established. Defendant told the officers he used the pocketknife to commit the offense, and the pathologist testified some of the wounds could have been made with the knife. We find no merit in the third argument.

TESTIMONY OF CASE AGENT ON REBUTTAL
In the fourth argument, defendant contends the court erred when it allowed the State to call Mosely as a witness on rebuttal. Defendant also claims the records of the justice of the peace which were introduced during Mosely's testimony were inadmissible as public records because the criminal charges were still pending.[1]
Prior to any testimony, all of the witnesses, including Mosely, were sequestered at the request of the State. Mosely was the investigator with the district attorney's office, and he testified as the State's last witness. After the State rested, the prosecutor asked that Mosely be designated as the State's case agent (apparently so he would be allowed to remain in the courtroom during the testimony of the defense witnesses). The prosecutor earlier had indicated Mosely might be called by the State on rebuttal, and, for that reason, defendant objected to him being designated the State's case agent. The court overruled the objection.
Defendant argues Mosely's testimony on rebuttal violates the rules regarding sequestration of witnesses. Article 615(A) of the Code of Evidence provides in pertinent part:
On its own motion the court may, and on request of a party the court shall, order that the witnesses be excluded from the courtroom or from a place where they can see or hear the proceedings, and refrain from discussing the facts of the case with anyone other than counsel in the case. In the interests of justice, the court may exempt any witness from its order of exclusion. However, this Article does not authorize exclusion of:
....
(2) A single officer or single employee of a party which is not a natural person designated as its representative or case agent by its attorney....
The purpose of sequestration is to assure that a witness will testify as to his own knowledge of the events, to prevent the testimony of one witness from influencing the testimony of others, and to strengthen the role of cross-examination in developing facts. The resolution of sequestration problems is within the sound discretion of the trial court. On appeal, the reviewing court will look at the facts of each case to determine if a sequestration violation resulted in prejudice to the accused. State v. Maize, 94-0736, p. 7 (La.App. 1st Cir. 5/5/95), 655 So.2d 500, 507, writ denied, 95-1894 (La. 12/15/95), 664 So.2d 451.
When defendant testified on cross-examination, he denied Mosely had served him with an order of the justice of the peace in December 1991. The order instructed defendant that the victim no longer wanted his presence on her property and told him not to harass or telephone her. On rebuttal, *972 Mosely testified he served defendant with a copy of the order on December 17, 1991. The apparent reason the State introduced both the order and testimony that the order had been served on defendant was to rebut testimony from defendant and other defense witnesses that defendant and the victim were having no problems.
Generally, the problem of exempting a witness as the state's representative, as allowed by article 615(A) of the Code of Evidence, is the potential danger his testimony might be influenced by listening to the testimony of the other witnesses. See State v. Parker, 625 So.2d 1364, 1373 (La.App. 1st Cir.1993), writ denied, 93-2832 (La. 2/25/94), 632 So.2d 761. In his brief to this court, defendant claims the testimony of Mosely on rebuttal, after being allowed to remain in the courtroom during the defense witnesses' testimony, prejudiced the defense because the testimony left the jury with the misguided and erroneous impression defendant planned the murder of his wife.
Mosely was not a fact witness to the stabbing. His testimony on rebuttal related to the testimony he gave in the State's case-in-chief concerning the prior incident. At the first trial, the justice of the peace testified he had Mosely deliver the order to defendant. Defendant did not testify at the first trial. The record gives no indication that, when the State asked the court to designate Mosely as the State's case agent, the prosecutor was aware defendant would deny knowing about the order. Although the justice of the peace did not testify at the second trial, Mosely's testimony (that he delivered the order to defendant) was brief and was consistent with the evidence presented at the first trial. Under these circumstances, defendant was not prejudiced Mosely's presence in the courtroom during the testimony of the defense witnesses. We thus find no error in the trial court's designation of Mosely as the State's case agent.
We also find no merit in defendant's argument concerning the admissibility of the records of the justice of the peace. When the order was introduced, defendant objected on the ground of hearsay. The prosecutor responded that the order was a public record, and the court overruled the objection. On appeal, defendant argues that records pertaining to pending criminal litigation or to any criminal litigation which can reasonably be anticipated are exempted from classification as public records. Defendant relies on Louisiana Revised Statutes 44:3 in support of his argument. Defendant's reliance on this statute is misplaced as the statute regulates "access" to public records, rather than admissibility of such records. Under the Code of Evidence, the order of the justice of the peace was not inadmissible as hearsay as it was not introduced to prove the utterances contained therein, but only to establish the existence and nature of the order. See La.Code Evid. art. 801(C); State v. Hodgeson, 305 So.2d 421, 425 (La.1974).
For the above reasons, we find no merit in the issues raised in the fourth section.

DENIAL OF MOTION FOR NEW TRIAL
In the fifth argument, defendant adopts all of the other arguments and argues the cumulative error requires the granting of a new trial. We have carefully reviewed each issue briefed by defendant and have found no reversible error. Furthermore, the combined effect of the incidences complained of did not deprive defendant of the right to a fair trial. There is no cumulative prejudicial impact nor is there a denial of due process. See State v. Copeland, 530 So.2d 526, 544-45 (La.1988), cert. denied, 489 U.S. 1091, 109 S.Ct. 1558, 103 L.Ed.2d 860 (1989); State v. Linson, 94-0061, p. 8 (La.App. 1st Cir. 4/7/95), 654 So.2d 440, 444-45, writ denied, 95-1120 (La. 9/22/95), 660 So.2d 470. This argument is without merit.

INSUFFICIENT EVIDENCE
In the sixth argument, defendant maintains the evidence does not support the conviction for second-degree murder and the verdict instead should have been manslaughter. Defendant claims he was intoxicated when he stabbed the victim and, thus, unable to form specific intent. He also contends he acted in the heat of passion.
In reviewing claims challenging the sufficiency of the evidence, this court must consider "whether, after viewing the evidence in the light most favorable to the prosecution, *973 any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979) (emphasis in original). See also La.C.Cr. P. art. 821(B); State v. Mussall, 523 So.2d 1305, 1308-09 (La.1988).
The applicable definition of second degree murder in this case is the killing of a human being "[w]hen the offender has a specific intent to kill or to inflict great bodily harm." La. R.S. 14:30.1(A)(1). Specific criminal intent is the "state of mind which exists when the circumstances indicate that the offender actively desired the prescribed criminal consequences to follow his act or failure to act." La. R.S. 14:10(1). Specific intent may be proved by direct evidence, such as statements by a defendant, or by inference from circumstantial evidence, such as a defendant's actions or facts depicting the circumstances. State v. Pittman, 93-0892 (La.App. 1st Cir. 4/8/94), 636 So.2d 299, 302.
Defendant does not contest that he stabbed the victim and that the stab wounds were the cause of death. He contests the sufficiency of the evidence of specific intent. Under the facts of this case, defendant's specific intent to kill or inflict great bodily harm can be inferred from the number of times he stabbed the victim. His activities after the murder are consistent with a finding of specific intent to kill as he rendered no aid and fled from the scene. The intent to kill also was evident in the threat he made during the prior incident.
Defendant argues his intoxication was such that it defeated the element of specific intent. On the day of the offense, defendant's family had a barbecue. According to the testimony of defendant, his mother, and his sisters, defendant started drinking alcoholic beverages early in the morning and continued to drink heavily throughout the day. Defendant testified, "I was drinking beer, gin, Cisco, Wild Irish Rose, you name it. If it was there, I was drinking it." Defendant claimed Cisco affected his mind to the point he was not aware of what he was doing. He was thirty-one when the offense occurred. He said he had been drinking since he was ten years old and sometimes experienced blackouts from drinking. Defendant's mother and sisters testified he was intoxicated that day. According to these relatives, whenever defendant gets drunk, his eyes get red, and he laughs and clowns around. They testified that on the day of the offense defendant's eyes were red, and he was clowning around. Defendant testified that, although he remembered talking to the victim's brother and her boyfriend, he did not remember the offense, his arrest, or giving a statement. He claimed it took him four days before he realized he was in jail.
Intoxication is a defense to a prosecution for second-degree murder if the circumstances indicate the intoxication, whether voluntary or involuntary, precludes the presence of specific criminal intent. See La. R.S. 14:15(2). When defenses which defeat an essential element of an offense, such as intoxication, are raised by the evidence, the State must overcome the defense by evidence which proves beyond a reasonable doubt that the mental element was present despite the alleged intoxication. See State v. Wisinger, 618 So.2d 923, 931-32 (La.App. 1st Cir.), writ denied, 625 So.2d 1063 (La.1993).
The evidence presented by the State was sufficient to prove the existence of specific intent despite defendant's consumption of alcohol. Outside the lounge, defendant asked Loretta Williams to go inside to tell the victim he wanted to talk to her. Williams testified defendant had no trouble walking, had no physical difficulties, and sounded the same as he had on previous occasions. Defendant was arrested not long after the offense. He was cooperative and followed the instructions of the deputies without incident. The deputy who searched defendant at the location of the arrest came within a foot of defendant's face and did not detect an odor of alcoholic beverages or notice any other signs of intoxication. The deputies and district attorney investigator who interviewed defendant at the sheriff's office also did not observe any evidence of intoxication. Defendant was coherent and answered the questions intelligently. He did not slur his speech and did not smell of alcoholic beverages. *974 His eyes were not bloodshot. Although he described in his statement the amount of alcohol he had consumed that day, he did not appear to the deputies to have consumed the amount he claimed.
The investigator from the district attorney's office testified he observed defendant during the previous incident in December 1991. At that time, it was apparent to him defendant had been drinking. The investigator compared defendant's appearance and behavior on the date of the murder to his demeanor during the prior incident and said defendant did not display any signs of intoxication on the date of the offense. Under these facts, we find no merit in defendant's argument that intoxication precluded the presence of specific criminal intent.
We now must determine if the circumstances indicate the crime was actually manslaughter because it was committed in sudden passion or heat of blood. Manslaughter is a homicide which would be either first-or second-degree murder, but the offense is committed in sudden passion or heat of blood immediately caused by provocation sufficient to deprive an average person of self control and cool reflection. La. R.S. 14:31(A)(1). "Sudden passion" and "heat of blood" are not elements of the offense of manslaughter, rather, they are mitigating factors in the nature of a defense which exhibit a degree of culpability less than that present when the homicide is committed without them. The State does not bear the burden of proving the absence of these mitigating factors. A defendant who establishes by a preponderance of the evidence that he acted in a "sudden passion" or "heat of blood" is entitled to a manslaughter verdict. In reviewing the claim, this court must determine if a rational trier of fact, viewing the evidence in the light most favorable to the prosecution, could have found the mitigating factors were not established by a preponderance of the evidence. State v. Huls, 95-0541, pp. 26-27 (La.App. 1st Cir. 5/29/96), 676 So.2d 160, 177, writ denied, 96-1734 (La. 1/6/97), 685 So.2d 126.
In an effort to establish defendant stabbed the victim in sudden passion or heat of blood, the defense presented testimony that defendant discovered the victim had a boyfriend when he came to Gibson in April. Defendant discussed the situation with the victim and felt secure about the marriage. During the week preceding the murder, the victim told her cousin she and defendant had gotten back together. Defendant and the victim spent three nights together that week, and witnesses who saw them together testified the couple did not appear to be having any problems and appeared to be in love. On the date of the offense, the victim failed to come to the family barbecue. According to defendant, after talking to the victim outside the lounge, he no longer felt secure about their relationship. Defendant testified that he loved the victim and did not intend for her to die. In his statement to the deputies and in his testimony at trial, defendant said Gregory Johnson, the victim's boyfriend, was present when he stabbed the victim. However, according to the testimony of the victim's brother, only he and the victim were present when defendant came from behind the trailer with the knife and started stabbing her.
The guilty verdict demonstrates the jury concluded either: (1) that the victim's refusal to return to Houston and her relationship with another man were not sufficient provocation to deprive an average person of self-control and cool reflection; or (2) that an average person's blood would have cooled by the time defendant stabbed the victim. See State v. Pittman, 636 So.2d at 304.
We have carefully reviewed the record and find the evidence supports the jury's verdict. The problems in the marriage started well before April. During the previous December, the victim had secured the order from a justice of the peace. When defendant gave his statement to the deputies, he agreed he stabbed the victim because he was upset she was still seeing Johnson. However, it was the deputy, and not defendant, who initially suggested this as the reason. The conversation defendant and the victim had outside the lounge was not violent. After the conversation, defendant apparently hid behind the victim's trailer and waited for her to return. We are convinced that a rational trier of fact, viewing all of the evidence as favorable to the prosecution as any rational fact-finder can, *975 could have concluded the State proved beyond a reasonable doubt that defendant was guilty of second degree murder and that the mitigating factors were not established by a preponderance of the evidence.
Accordingly, the arguments raised in this section are without merit.

PATENT ERROR
In reviewing the record for patent error, we have discovered the trial court did not wait the required twenty-four hours after denial of defendant's motion for new trial before imposing sentence, nor did defendant waive the waiting period. See La.C.Cr.P. art. 873. Defendant does not raise this issue on appeal and has not challenged the sentence on appeal. Thus, the error is not reversible unless he can show he was prejudiced. See State v. Augustine, 555 So.2d 1331, 1333-34 (La.1990). On appeal, defendant has not cited any prejudice resulting from the court's failure to delay sentencing, nor has he even noted this failure as error. We have reviewed the record and find no indication defendant was prejudiced by the error. Thus, the error is not reversible.
We also have found error in the sentence. The trial court did not give defendant credit for time served. See La.C.Cr.P. art. 880. Accordingly, we amend the life sentence to reflect that defendant is to be given credit for any time served prior to execution of his sentence. See State v. King, 604 So.2d 661, 670 (La.App. 1st Cir.1992). Resentencing is not required. However, we remand the case and order the district court to amend the commitment and the minute entry of the sentencing to reflect that defendant is to be given credit for time served.
CONVICTION AND SENTENCE AFFIRMED AS AMENDED. REMANDED WITH ORDER.
NOTES
[1] In this section, defendant also argues Mosely's testimony regarding the incident from December 1991 was inadmissible other-crimes evidence because defendant never was convicted of the previous charge and the incident occurred over four months before the murder. These issues are related to the arguments made in defendant's second argument, and we have addressed the arguments in that section.